## Court of Appeals.

October, 1901.

## THE PEOPLE v. ROLAND B. MOLINEUX.

(168 N. Y. Rep. 264.)

1. MURDER—EVIDENCE—PROOF OF OTHER CRIMES NOT ALLEGED IN INDICTMENT.

> The general rule of evidence is that when a man is put upon trial for one offense, he is to be convicted, if at all, by evidence which shows that he is guilty of that offense alone, and under ordinary circumstances, proof of his guilt of one or a score of other offenses in his lifetime, is wholly excluded.

2. SAME—EXCEPTION TO RULE.

> Generally speaking, evidence of other crimes is competent to prove the specific crime charged when it tends to establish (1) motive, (2) intent, (3) the absence of mistake or accident, (4) a common

scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others, (5) the indentity of the person with the commission of the crime on trial.

3. SAME—MOTIVE.

When evidence of extraneous crimes has been held competent upon the existence of motive, it must be either the specific motive, underlying the particular crime charged, or a motive common to all of the crimes sought to be proved.

4. INTENT.

While previous offenses of a similar character by the same person may be proved to show felonious intent, such testimony has no weight where it fails to throw any light upon the intent with which the subsequent crime was committed, or to support or strengthen the inferences as to intent which may be drawn from the evidence tending to show that defendant committed the subsequent crime.

5. SAME—MISTAKE OR ACCIDENT.

Where a rare, subtle and deadly poison was mixed with a harmless powder of common use and sent by mail at Christmas time to the victim, proof of a prior extraneous crime of similar character could not be necessary or proper to anticipate the impossible defense of accident or mistake.

6. SAME—COMMON PLAN OR SCHEME.

To make one criminal act evidence of another, a connection between them must have existed in the mind of the actor linking them together for some purpose he intended to accomplish; or it must be necessary to identify the person of the actor by a connection which shows that he who committed the one must have done the other.

7. SAME—IDENTITY.

The mere fact that two crimes are parallel as to the method and means employed in their execution does not serve to identify the defendant as the person guilty of the crime, unless his guilt of the latter crime may be inferred from its similarity to the former, and where there is no evidence showing that defendant committed the former crime, and that no other person could have committed the subsequent crime, such an inference is not justifiable.

8. SAME.

The declarations of a victim of a former poisoning, to his physician, that he received a box of medicinal powder claimed to have contained the poison used, through the mails, are incompetent upon the trial of the charge of the subsequent poisoning of another person by a similar poison, also received through the mails.

9. SAME—EVIDENCE AS TO HANDWRITING AT COMMON LAW.

While under the common law comparison of handwriting might be made between documents properly in evidence for other purposes, and the disputed writing, in order to determine whether the writer of the

other documents was also the writer of the disputed paper, yet no document could be introduced merely as a standard of comparison with the disputed writing.

10. SAME—DISPUTED WRITING UNDER THE STATUTES.

The "disputed writing" referred to by the statutes is any writing which one party upon a trial seeks to prove as the genuine handwriting of any person, and which is not admitted to be such, providing the writing is not inadmissible under other rules of evidence.

11. SAME—COMPARISON WITH REQUESTED WRITINGS.

Writings made by the accused at the request of a handwriting expert retained by the police authorities while the inquest was in progress upon a death by poisoning, and while defendant was suspected to his own knowledge of being the murderer and under subpoena to testify but not under arrest, are submissible as standards of comparison at the subsequent trial, with the handwriting upon a package containing poison which he is accused of having feloniously sent through the mails.

12. SAME—RULES AS TO STANDARDS OF COMPARISON.

The genuineness of writings which when "proved to the satisfaction of the court" may be compared with a disputed writing, may be established (1) by the concession by the person sought to be charged with the disputed writing made at or for the purposes of the trial, or by his testimony; (2) or by witnesses who saw the standard written, or to whom, or in whose hearing, the person sought to be charged acknowledged the writing thereof; (3) or by witnesses whose familiarity with the handwriting of the person who is claimed to have written the standard enables them to testify to a belief as to its genuineness; (4) or by evidence showing that the reputed writer of the standard has acquiesced in or recognized the same, or that it has been adopted and acted upon by him in his business transactions or other concerns.

13. SAME—RULE OF EVIDENCE IN CIVIL AND CRIMINAL CASES.

In civil cases the genuineness of writing for comparison with disputed writings must be established by a fair preponderance of the evidence, and in criminal cases beyond a reasonable doubt.

14. SAME—CONSTITUTIONAL LAW—N. Y. CONSTITUTION, ART. I, SEC. 11.

The statutes of 1880 and 1888, authorizing comparison of a disputed handwriting with any writing proved to the satisfaction of the court to be genuine are constitutional and are not in conflict with article I, section 11, of the Constitution of the State, which provides that "trial by jury in all cases in which it has been heretofore used shall remain inviolate forever."

15. SAME—RIGHTS OF WITNESSES AT INQUESTS.

If a person who testifies at an inquest does so simply as a witness, he has none of the rights or immunities of a party, and his testimony

can be used against him even though he is afterwards indicted and tried for the commission of the crime disclosed by the inquest.

16. SAME.

The fact that the district attorney, in his summing up to the corner's jury, stated that he had from the beginning suspected the defendant of the commission of the crime, but had pretended to suspect C., so as to lull the defendant into a state of security, was not such a material error as to forbid the admission of evidence upon the trial of the defendant's testimony given before the coroner.

APPEAL from a judgment of the Court of General Sessions of the Peace in and for the city and county of New York, rendered February 16, 1900, upon a verdict convicting the defendant of the crime of murder in the first degree.

The facts, so far as material, are stated in the opinion.

John G. Milburn, Bartow S. Weeks, George Gordon Battle and H. Snowden Marshall, for appellant.

Eugene A. Philbin, District Attorney (David B. Hill of counsel), for respondent.

WERNER, J.: In various forms and in several separate counts the indictment herein charges the defendant with the crime of murder in the first degree. The substance of the charge is that defendant killed one Katharine J. Adams while engaged in the commission of a felony upon and against the body of one Harry S. Cornish. The agency charged to have been employed for this purpose is cyanide of mercury, a rare and deadly poison, which is said to have been sent through the mails by the defendant to said Cornish with the intent that it should be taken by the latter. Direct evidence was adduced upon the trial to establish the fact that Cornish received by mail a package which contained cyanide of mercury, and that he innocently administered to said Katharine J. Adams a portion of its contents, thereby causing her death. The legal questions which it is our duty to consider upon this appeal cannot be intelligently discussed without a clear understanding of the complicated facts and cir-

cumstances upon which the prosecution seeks to sustain the judgment of conviction against the defendant. In the effort to simplify the recital of these facts and circumstances we shall classify them into the several separate co-ordinate groups to which they belong, without reference to their chronological relation to each other, and without discussing the competency of the evidence by which they are claimed to have been established.

The facts which bear immediately upon the death of Katharine J. Adams and its cause are as follows: On the morning of December 24, 1898, Cornish received through the mail a package in which was found a pale blue box containing a silver holder and a blue bottle bearing a "bromo seltzer" label and filled with a powder purporting to be "bromo seltzer." The bottle fitted into the bottle holder. Accompanying these articles was a small envelope of the kind in general use for inclosing cards which are sent with gifts. There was no card in the envelope. Cornish, believing that some person had sent him a Christmas gift and finding no card, recovered the outside wrapper of the package, which had been thrown into the waste basket, and found written upon it the address "Mr. Harry Cornish, Knickerbocker Athletic Club, Madison Avenue and Forty-fifth St., New York City." He cut, or tore, this address from the wrapper and placed it in his desk together with the envelope, the bottle and silver bottle holder. On the following day, December 25, 1898, Cornish, who was a member of the household of Katharine J. Adams, mentioned the receipt of these articles to the latter and her daughter, Mrs. Rodgers, and on the 27th of December, 1898, he took them home with him and exhibited them to the same persons. As a result of the conversation which ensued, Cornish presented the silver bottle holder to Mrs. Rodgers, who had other toilet articles resembling it in design. Cornish placed the "bromo seltzer" bottle on the dresser in his room and retired for the night. On the next morning, December 28, 1898, Cornish arose shortly before nine o'clock and went to the door for his morning paper. In passing the kitchen door he observed Mrs. Adams with her

head bandaged and a few minutes later Mrs. Rodgers informed Cornish that her mother had a headache and asked him for some of the "bromo seltzer" he had brought home. Cornish gave the bottle to Mrs. Rodgers who attempted to open it, without success, and she thereupon returned it to Cornish requesting him to do so. He opened the bottle and, after reading the directions upon the label, he poured a teaspoonful of the contents into a glass held by Mrs. Adams and stirred it while she poured water upon it from another glass. After the dose had been prepared Mrs. Adams drank from it. As she put down the glass she commented upon the peculiar taste of the mixture, whereupon Cornish remarked "why that stuff is all right" and swallowed a portion of what remained in the glass. Meanwhile Mrs. Adams had started for the kitchen and in less than a minute Mrs. Rodgers called from the bathroom for help for Mrs. Adams. As Cornish arose from his chair, to respond to the summons, his "knees went out from under him," but by an effort he succeeded in reaching Mrs. Adams just as she dropped to the floor in a state of collapse. Cornish, being unable to lift Mrs. Adams, the daughter called a Mr. Hovey, who was in the house, and together they carried Mrs. Adams to a couch in the dining room. Cornish despatched a hallboy for a physician, returned for his coat and hat, picked up the bottle from which the dose had been taken and ran to a neighboring druggist who gave him "aromatic spirits of ammonia" with directions for administering it. Cornish returned to the house and Dr. Hitchcock closely followed him. The doctor hurried to Mrs. Adams who was breathing hard, her face overspread with a dark blue pallor and exhibiting evidence of great pain. Restorative measures were employed without avail, and upon the arrival of Dr. Potter, who had also been sent for, Mrs. Adams was dead. During the period which elapsed between the taking of the dose and the death of Mrs. Adams, Cornish had been retching and trying to vomit. After the death of Mrs. Adams Dr. Hitchcock went in to see Cornish who told him that Mrs. Adams had taken a dose of "bromo seltzer" and

handed the bottle to the doctor. Mrs. Rodgers informed Dr. Hitchcock that Cornish had taken some of the same stuff that Mrs. Adams had taken. The doctor put his finger into the bottle and, extracting some of the powder, tasted it. He detected the odor of almonds which is characteristic of the cyanogen group of poisons, of which prussic acid is the base. He began to feel ill and took whisky to counteract the effect of the powder. Dr. Hitchcock then took possession of the "bromo seltzer" bottle, the silver bottle holder and the address. He and Cornish left the house together and went to an undertaker. There they separated, the doctor returning to his home and Cornish going down town to see Assistant District Attorney McIntyre to notify him of Mrs. Adams' death. After seeing McIntyre, Cornish called upon a personal friend named Yocum, a chemist by profession, who noticed that Cornish looked ill and prevailed upon him to take a drink of whiskey, which he was not able to retain. Then Cornish proceeded to the office of his cousin, Louis H. Cornish, who was also a cousin of Mrs. Rodgers, the daughter of Mrs. Adams, and informed him of the latter's death. From thence Cornish went to the Knickerbocker Athletic Club, where he lay down upon the bed in Yocum's room. During the whole of his trip down town and return Cornish had been ill, the journey being marked by frequent interruptions necessitated by the condition of his stomach and bowels. Soon after arriving at the club house he sent for Dr. Phillips, who could not be found immediately, and Dr. Coffin, who happened to be in the club house, was requested to see Cornish. He found Cornish in bed belching gas from his stomach, and his bowels and stomach considerably distended. The patient's pulse was weak and intermittent. There was no odor which the doctor recognized. He diagnosed the case as one of "gastric enteritis." He sent for stomach and rectal tubes, and while waiting for them Dr. Phillips arrived. The two doctors, Phillips and Coffin, treated Cornish. The latter was pale and ashen. He had the appearance of having passed through a long illness. The first police officer to arrive at the

Adams house was Patrolman Palmer. This was in the afternoon of December 28th, 1898. From there he went to Dr. Hitchcock and got the "bromo seltzer" bottle, the bottle holder and the address taken from the wrapper. These he turned over to Dr. Weston, the coroner's physician. The latter visited the Adams house and viewed the body of Mrs. Adams. On the following day, December 29th, 1898, Captain McClusky, chief of the detective bureau of New York, took charge of the police investigation. On the same day Dr. Weston performed an autopsy on the body of Mrs. Adams, as a result of which he later concluded that the death of Mrs. Adams was due to poisoning which resulted from hydrocyanic acid, or one of its salts, which is produced by the combination of cyanide of mercury with the ingredients of bromo seltzer. On the following day, December 31st, 1898, Prof. Withaus, an expert chemist, made an analysis of the contents of the "bromo seltzer" bottle and later reported that it contained a mixture of bromo seltzer and cyanide of mercury. The same chemist also analyzed the sediment of the glass from which the dose administered to Mrs. Adams, and tasted by Cornish, had been taken. This was found to contain cyanide of mercury. The organs of Mrs. Adams were also subjected to an analytical examination by Prof. Withaus, which demonstrated that Mrs. Adams had died from mercuric cyanide poisoning. A pathological examination of these organs by Dr. Ferguson disclosed the presence of corrosive poison which he described as cyanogen or prussic acid, which is a poison resulting from cyanide of mercury. The death of Mrs. Adams and its immediate cause were, therefore, clearly established.

The logical and orderly narration of this grewsome tragedy naturally leads, next, to a consideration of the facts and circumstances which are relied upon by the prosecution to connect the defendant with the death of Mrs. Adams. We will first address ourselves to those which have no relation to handwriting or to the commission of any other crime than the killing of Mrs. Adams.

In 1898 the defendant was thirty-one years of age. He had not only a liberal general education, but sufficient knowledge in chemistry to be the superintendent in the business of Morris Hermann & Company, who were manufacturers of dry colors in Newark, N. J. He had been employed in this capacity since 1893, and before that had been in charge of colormaking for the firm of C. T. Raynolds & Company, of which his father was a member. He had studied chemistry for two years at Cooper Union. He had a good chemical library, and a well-equipped laboratory, which contained Prussian blue, chrome yellow, English vermilion, dry mercury, arsenic and other chemicals from which various poisons, including cyanide of mercury, could be produced. From these facts the prosecution argue that defendant had the knowledge, skill and means to produce the poison which killed Mrs. Adams.

Cornish was athletic director in the Knickerbocker Athletic Club in 1898, and had held this position since January, 1896. At that time defendant was a member of the club and of its house committee. In January, 1896, difficulties arose between the defendant and Cornish over the conduct of one French, an athletic member of the club. This was followed in April, 1897, by trouble over an amateur circus which was given under the auspices of the club. Molineux had charge of the arrangements, and complained because Cornish had ignored and disobeyed his instructions. Cornish had been superintendent of the club and manager of the club restaurant. Defendant complained that the restaurant and baths were not being properly conducted. Cornish's authority was thereafter reduced to the training of the club teams and the management of athletics. Then came the trouble over the "Weefers" letter written by Cornish in August, 1897, and in which the latter reflected upon Mr. Weeks, a director of another athletic club. The defendant, having come into possession of this letter, requested that the matter be brought to the attention of the house committee, and suggested that Cornish be reprimanded or discharged. This request was not complied with, and then,

through defendant's efforts, a dinner was given to Mr. Weeks by Mr. Ballantine, a leading spirit and principal stockholder in the club, at which various club officials and the defendant were present, and apologies were tendered to Mr. Weeks. Early in 1897, Hughes, chairman of the house committee, told the defendant that Cornish had said that defendant had made his money as a rumseller or by keeping a place of questionable repute. Defendant insisted that this matter, together with other grievances, be investigated by the club. Some investigation was made, but, as Cornish denied having made the statements attributed to him, no further action was taken. The defendant continued to agitate the alleged shortcomings and misdeeds of Cornish until he finally told Adams, the secretary of the club, that if Cornish did not leave the club he would leave. Cornish was retained in the club, and on December 20th, 1897, the defendant resigned. After his resignation, and on the same evening, the defendant and Cornish met on the stairs of the club house. Cornish called the defendant a vile name and taunted him with his failure to procure Cornish's discharge. Defendant's resignation was followed by an explanatory letter from him to Secretary Adams, dated September 24th, 1897. This was followed by a letter from defendant to a Dr. Austen, inclosing a copy of the "Weefers" letter and dwelling upon the conduct of Cornish. After this, in October, 1898, the defendant met one Heiles at the New York Athletic Club, told him of the "Weefers" letter and complained of the action of the board of governors of the Knickerbocker Athletic Club. On this occasion the defendant referred to Cornish as a low, vile, bad man, and spoke of the latter's assertion that defendant had kept a disreputable house. On November 9th, 1898, the defendant wrote to his friend Sheffler, inclosing a copy of the "Weefers" letter and referring to the fact that "Cornish is in" and he is out. These are the facts and circumstances narrated in mere outline that are relied upon by the prosecution

as evidence of the motive which the defendant is said to have had against the life of Cornish and of the intent with which the poisoned bromo seltzer was sent to the latter. As further bearing upon defendant's connection with this murder it was shown that the silver bottle holder which was contained in the package received by Cornish had been purchased on the 21st day of December, 1898, at Hartdegan & Co.'s store in Newark, N. J., which was only a short distance from the factory of Herrman & Co., where the defendant was employed. The defendant was seen in the vicinity of the Hartdegan store on that day, but the clerk who made the sale of the bottle holder said the defendant is not the man who bought it. The box which contained the bottle and bottle holder was a "Tiffany" box, and the envelope was such as are used at Tiffany's to inclose cards which are sent with gifts. The defendant had an account at Tiffany's, and made a purchase there in December, 1898. There are no particulars regarding this purchase except that it was in the stationery department. The so-called poison package was mailed at the general post office on the afternoon of December 23rd, 1898, at an hour when it was customary for the defendant to be in the post office district on his return from Newark to New York.

At this point it will be observed that if the case had been tried upon the theory that the only crime which the defendant had committed was the killing of Mrs. Adams in the attempt to poison Cornish, the next and final step in the case of the prosecution would have been to prove the defendant's connection with the handwriting of the address upon the poison package. But, as a part of the theory or theories upon which the prosecution sought to connect the defendant with the killing of Mrs. Adams, evidence was offered and received to show that the defendant was responsible for the previous killing of one Henry C. Barnet, who came to his death at the Knickerbocker Athletic Club house on the 10th day of November, 1898.

The facts and circumstances upon this branch of the case, as established at the trial, which relate directly to the death of Barnet, are substantially as follows: Barnet had been a member of the Knickerbocker Athletic Club for a number of years, and in 1898 was living at the club house. Barnet was taken ill on the 28th day of October, 1898. He was first attended by Dr. Phillips, the same physician who subsequently attended Cornish. Dr. Phillips only attended Barnet on the first day of his illness, and Dr. Douglass then took charge of the patient and attended him until his death on November 10th, 1898. In the death certificate issued by Dr. Douglass "cardiac asthenia, caused by diphtheria," was assigned as the cause of Barnet's death. Dr. Douglass was given a box which was found in Barnet's room and purported to contain "Kutnow" powder, and the latter told the former that he had received it by mail, had taken a dose of it, and he thought that was the cause of his trouble. Barnet also told Dr. Phillips that he had taken a dose of "Kutnow" powders and ascribed his trouble to that. Dr. Douglass took possession of this box on November 4th, 1898, and gave it to Guy P. Ellison, a chemist, who made a qualitative analysis and concluded that the "Kutnow" powder contained cyanide of mercury. The box was returned to Dr. Douglass with the chemist's report as to its contents, and thereupon the nurse in charge of Barnet was directed to search for the wrapper. No wrapper was ever found. On the 3d day of January, 1899, Dr. Douglass delivered to Captain McClusky the box taken from Barnet's room. On the 4th day of January, 1899, Captain McClusky delivered it to Prof. Withaus. The latter made an analysis of its contents and found it to contain "Kutnow" powder and cyanide of mercury. On the 28th day of February, 1899, the body of Barnet was exhumed at Greenwood cemetery, in the presence of Dr. Douglass, Prof. Withaus, Dr. Weston and others. Prof. Withaus made an analysis of the liver, kidneys and other organs in the body and found cyanide of mercury. Dr. Loomis, a pathologist, made a postmortem examination and expressed the opinion that Barnet

died from poisoning by mercury. Dr. Smith, who consulted with Dr. Douglass on the day of Barnet's death, was of the same opinion. Dr. Ferguson testified that the cause of this death was cyanide of mercury and Dr. Potter concurred in that opinion. The discrepancy between the cause of death assigned in the death certificate of Dr. Douglass and the conclusions which followed the analyses of the deceased Barnet's organs and the contents of the "Kutnow" powder-box, is sought to be accounted for by the explanation that mercuric poisoning at certain stages develops the symptoms of diphtheria and by various other matters which are not essential to this statement. The death of Barnet was, therefore, clearly established, and the alleged cause thereof was proved by evidence which, if competent, would warrant the conclusion that it was due to mercuric cyanide poison.

As to the motive which the defendant is said to have harbored for the killing of Barnet, the prosecution gave evidence which, it was claimed, tended to show that the defendant was jealous of Barnet's attentions to the woman with whom the defendant was in love. In that behalf the facts, as presented by the prosecution and in part sustained by the evidence, are substantially as follows: In the summer of 1897 the defendant met Miss Cheeseborough at Portland, Maine. His attentions to her, which were immediate and marked, continued during their visit in Portland and were renewed after the return of Miss Cheeseborough to New York city. The defendant and Barnet were both members of the Knickerbocker Athletic Club and apparently good friends. In the fall of 1897 the defendant presented Barnet to Miss Cheeseborough at the Metropolitan Opera House. At this time the latter lived in apartments in the "Marie Antoinette" in New York city, but in a few weeks she took a room in the house of Mrs. Bell at No. 251 W. 75th street, New York city, where she remained until January, 1898. At this point in the chronology of the relations between the defendant and Miss Cheeseborough certain evidence was introduced by the prosecution which was

afterwards ordered stricken from the record by the court, but for the purpose of preserving the continuity of the narrative of this branch of the case, and because certain questions have been raised concerning this evidence, it will be inserted here as though it had remained in the record.   One Rachel Green, a colored woman who was employed at No. 251 W. 75th street, from November 2nd, 1897, to May 1st, 1898, testified that when she went to this house in November, 1897, Miss Cheeseborough and a man whom she thought she was able to identify as the defendant occupied the same room under the names of Mr. and Mrs. Cheeseborough, and that the only time she ever heard the name of Molineux mentioned there was on an occasion when a parcel came from a drug store addressed to that name.   This witness further testified that in January, 1898, the "Cheeseboroughs" left the house of Mrs. Bell together.   William Williams, who washed windows and took care of the furnace at the house of Mrs. Bell in 75th street from the autumn of 1897 to May, 1898, pointed from the witness stand to the defendant as a man whom he had seen at Mrs. Bell's on several occasions.   He gave further and more explicit testimony upon the subject but that was stricken out as hearsay. Minnie Betts, another colored woman, testified that she lived with Mrs. Bellinger at 257 West End avenue, and that in January, 1898, Miss Cheeseborough came to live there and remained until June, when she went away for the summer and returned in the fall.   This witness testified that the first time she ever heard the name of Molineux was about a week before the defendant and Miss Cheeseborough were married, in November, 1898.   This witness also described a man, not the defendant, who frequently called on Miss Cheeseborough at Mrs. Bellinger's house.   During her examination this witness was shown a visiting card and a photograph which were used in connection with the name of Barnet in such a way as to leave no doubt in the minds of the jury that the caller whom she had been trying to describe was in fact Barnet.   The defendant himself testified, at the coroner's inquest upon the death of Mrs.

Adams, that Barnet called upon Miss Cheeseborough, took her to dinners, theatres and other places of amusement and sent her flowers. On one occasion she went to an entertainment given by the Knickerbocker Athletic Club as the guest of Barnet, and while there was one of a number who visited Barnet's room and drank wine. The defendant says that on the occasion referred to Barnet escorted Miss Cheeseborough at his request. The defendant admitted that he had proposed marriage to Miss Cheeseborough in the winter of 1897, and that his offer had been declined. Three or four days before Barnet's death Miss Cheeseborough wrote him a letter expressing her solicitude over his illness. This letter was couched in language from which it could easily be inferred that there existed between Miss Cheeseborough and Barnet an attachment stronger than mere platonic friendship. The defendant, in testifying before the coroner, stated that when he learned of Barnet's illness he communicated the fact to Miss Cheeseborough and it was agreed between them that the latter should send Barnet some flowers. The defendant also asserted that he bought the flowers himself, and, although he assumed that a card or letter would be sent with them, he never knew of the letter above referred to. Barnet died November 10th, 1898. About two weeks later the defendant wrote to a friend with whom he had expected to take tea on the following Sunday evening, asking to be excused because of his sudden and romantic engagement to be married on the succeeding Tuesday. On the 29th day of November, 1898, nineteen days after Barnet's death, the defendant and Miss Cheeseborough were married. From this evidence bearing upon the alleged relations of the defendant and Barnet to Miss Cheeseborough it is contended by the prosecution that the defendant was jealous of Barnet because of the apparent favor with which the latter's attentions had been received by Miss Cheeseborough and that this was the mainspring of the motive which prompted the killing of Barnet.

The foregoing outline of the facts which conclusively establish the death of Barnet and Mrs. Adams, respectively, and which tend to prove the cause thereof, and of the circumstances which are relied upon to connect the defendant therewith, naturally leads us, next, to a consideration of the other related facts and circumstances which are said to bear upon the handwriting of the poison package address and upon defendant's connection with the murder of both Barnet and Mrs. Adams.

We will first consider the "Barnet" letter box and its correspondence.  One Nicholas Heckmann testified, in substance, that in May, 1898, he kept private letter boxes for rent at No. 257 W. 42nd street, New York city.  On Friday, May 27th, 1898, shortly after six o'clock, the defendant came to his place and rented a letter box in the name of *H. C. Barnet.*  Defendant was given a ticket for box 217.  Defendant called about twenty times after that and the witness delivered to him the mail addressed to H. C. Barnet, the general nature of which was patent medicine of various kinds.  One package was described as being marked "Kutnow powder" and another " Von Mohl's Calthos."   The witness identified a box which came to box 217 some time in June, 1898, but was never called for and was delivered to the district attorney, who procured it to be analyzed.  Late in the summer of that year the real H. C. Barnet received through the mail, at his office in the Produce Exchange, a box marked "Calthos" containing a number of pink capsules.  The medicine bearing this name was advertised as a remedy for impotence.  A similar package was found in Barnet's desk after his death.  Some of the mail addressed to this box 217 was never called for.  Part of it consisted of four letters, the envelopes of three of which bore the post office box number of Von Mohl & Co., of Detroit, and the fourth of which bore the post office box number of Dr. Fowler, of Moodus, Conn.  These were marked 58, 61, 62 and 63 in the so-called prime series.  Nine letters and communications were written in the name of H. C. Barnet.  These, together with five "Bar-

net" envelopes, comprise the so-called "Barnet" series and are marked B, B², C, F, H, I, J, K, M, N, O, P, Q and R respectively. "B" is an order for Dr. Rudolphe's specific for impotence, received by Dr. Fowler June 1st, 1898, and "B²" is the envelope in which it was mailed. "C" is a letter to the Marston Remedy Co., dated May 31st, 1898, writing for one month's treatment for the same trouble. "F" is a letter to Cameron & Co., received by them June 1st, 1898, asking for "Book," and "J" is the envelope in which it was mailed. "H" is a letter to Marston & Co., received by them June 6th, 1898, asking for marriage guide, and "K" is the envelope in which it was mailed. "I" is the so-called "diagnosis blank" sent by Marston & Co. in answer to the request for marriage guide, and returned to Marston & Co. on the 4th or 5th of June, 1898, in the name of Barnet, but filled with answers which are said to accurately describe the defendant and not Barnet. "M" is a letter to Von Mohl & Co., received by them June 1st, 1898, requesting "five days' treatment," and "N" is the envelope in which it was mailed. "O" is a letter to the "Sterling Remedy Co.," received by them June 6th, 1898, asking for "Book." "P" is a letter to G. B. Wright, Marshall, Mich., written about June 1st, 1898, asking for prescription, and "R" is the envelope in which it was mailed. It may be noted in passing that none of these "Barnet" letters contain any reference to any powder or substance which was used or, so far as appears, could be used, in mixing with, or in the administration of, the poison by which Barnet and Mrs. Adams are alleged to have been killed.

We now come to the "Cornish" letter box and the correspondence written in the name of Cornish. One J. J. Koch testified that in December, 1898, he had for five years conducted a letter box agency at 1620 Broadway under the name of the Commercial Co. He was also the proprietor of the "Studio Publishing Co.," under which name an advertising agency was conducted at the same place. Under date of December 31st, 1897, the defendant, through his secretary, Mr. Allen, wrote upon the business stationery of Morris Hermann & Co. to the

Studio Publishing Co. for a sample copy of the paper. In July, 1898, Koch sent to defendant a printed circular upon which attention was called to the private letter box agency which was being conducted at No. 1620 Broadway, in connection with the advertising business. During the week of December 12, 1898, the defendant made inquiry of Koch about renting a private letter box for a friend. No box was rented on that day. On December 21, 1898, a box was rented to a man, not the defendant, under the name of H. Cornish. Four pieces of mail were received at this box addressed to "H. Cornish." One was a sample box of "Kutnow" powder. The second was a circular letter from Von Mohl & Co. The third was a sample box of "Calthos," manufactured by Von Mohl & Co. Koch testified that by mistake all of these were placed in a different box than that assigned to H. Cornish and remained in the wrong box until January 14th, 1899, when Koch delivered them to Captain McClusky. The fourth was a letter bearing the name of Frederick Stearns & Co., Detroit, Mich., upon the envelope. This was seen by Koch and placed in the "Cornish" box. It was not there on January 14th, 1899, when the others above referred to were delivered to Captain McClusky. It was called for by some unknown person in the absence of Koch. The discovery of this "Cornish" mail led to investigations as the result of which Exhibits "D," "E" and "G," written in the name of "Cornish" came into the hands of the police authorities. Exhibit "D" is a letter signed "H. Cornish," addressed to Frederick Stearns & Co., Detroit, Mich., and received by that firm December 24th, 1898, stating in substance that one A. A. Harpster had applied to the writer for a position as collector and requesting a line in reply to be sent to 1620 Broadway, New York city. At this point it may be stated that Harpster was a man who had formerly been in the employment of Stearns & Co., and had subsequently been employed at the Knickerbocker Athletic Club, where he was very friendly to Cornish and had incurred the ill-will of the defendant because of his adherence to Cornish in the difficulties between the latter and the

defendant. At the time the " Cornish " letter was written to Stearns & Co. Harpster was employed by Ballantine & Co., and had not applied to any one for the position of collector. Upon this feature of the case it also appeared that in October, 1898, the defendant met one Heiles who had been employed at the Knickerbocker Athletic Club at the time when Barnet, Cornish, Harpster and the defendant were all connected with it. At that time the defendant requested Heiles to arrange to have a letter written to Stearns & Co., asking for information regarding Harpster. The defendant explained to Heiles that the purpose for which he wished to use this letter was to procure Harpster's discharge if the reply from Stearns & Co. should be suitable for that purpose. Heiles did arrange to have such a letter written about October, 1898, and a reply was received which was given to Heiles, who showed it to the defendant. The defendant said he was too busy to look at it then, and told Heiles to keep it. Heiles kept the letter until after the arrest of the defendant, when he destroyed it. "Exhibit E" is a letter signed "H. Cornish," received by "Kutnow Bros." December 22nd, 1898, and requesting that a sample of salts be sent to 1620 Broadway, New York city. Exhibit "G" is a letter signed "H. Cornish," received by "Von Mohl & Co.," the manufacturers of "Calthos," requesting said firm to send "five days' trial" to 1620 Broadway, New York city. This letter was received from Von Mohl & Co. by Witte, assistant chief of police in Cincinnati, and by him turned over to Captain McClusky. Each of these three letters, Exhibits "D," "E" and "G," was written upon a peculiar paper of "egg-blue" tint, bearing a "tri-crescent emblem." The same kind of paper was used for the so-called "Burns" letter (Exhbit 2), which was received June 1st, 1898, by one Agnes Evans, acting for Dr. James Burns, who was requested to "send remedy" to Roland Molineux, Jersey street, Newark, N. J. The defendant admits having written the "Burns" letter. In this connection it is proper to refer to the evidence of Mary Melando, the forewoman at Hermann & Co.'s factory in Newark, N. J. She took care

of the defendant's rooms. Upon the trial she was shown
People's Exhibits "D," "G" and "E" and "Exhibit 2." She
said she had seen paper like that in the drawer of the sideboard
in the defendant's room at the Newark factory. She saw about
a half dozen sheets as late as October, 1898. The witness took
three sheets of this paper for her own use and left about three
sheets of it in the drawer of the sideboard. It also appears in
the case that paper like this was on sale at four of the large
department stores in New York city and at two stores in
Newark, N. J., at one of which, that of Plumb & Co., the
firm of Hermann & Co. had an account. The foregoing writ-
ings, called the "Barnet" letters and the "Cornish" letters,
were used in the case for the avowed purpose of connecting the
defendant with the murder of Mrs. Adams. As a part of the
theory or theories upon which these writings were admitted in
evidence certain genuine and proved or conceded writings of
the defendant, of the "real" Barnet and of the "real" Cornish
were received in evidence.

This brings us to a statement of that branch of the evidence
by which the prosecution claims to have established the cul-
minating proof that the defendant was the writer of the ad-
dress (Ex. A) upon the poison package received by Cornish.
The evidence upon the subject of handwriting proceeds along
several distinct lines, and the history of each will be stated
separately. On the 29th day of December, 1898, the day after
Mrs. Adams' death, one of the newspapers in New York city
published what was called a *fac simile* of the poison package
address. It is known in the case as defendant's "Exhibit 12."
This was seen by John D. Adams, the secretary, and Andre
Bustanoby, superintendent of the Knickerbocker Athletic Club.
After seeing this Mr. Adams found some letters in the hand-
writing of the defendant which were on the files of the club.
These were shown to Bustanoby. Both men were familiar with
the defendant's handwriting, and were struck with the re-
semblance between "Exhibit A," the poison package address,
and "Exhibit 12," the newspaper copy. On December 30th,

1898, Adams showed Cornish Exhibit 12 and a number of the defendant's letters with the signatures turned down. Among the latter were Exhibits 20, 21, 22 and 24, which are part of the series of defendant's conceded handwritings. As a result of this interview Cornish telephoned to Captain McClusky. Adams and Bustanoby testified that "Exhibit A" was in the handwriting of the defendant. One Martin, who had been teller of the Essex County National Bank of Newark, N. J., where the defendant had an account, said he had known the latter's signature for four years and, from his knowledge thereof, as well as his experience in comparing and scrutinizing handwritings, he concluded that the writing on "Exhibit A" was that of the defendant. These three are the only witnesses who testified to a belief that the defendant was the writer of the address of the poison package, based upon a personal knowledge of defendant's handwriting.

We now come to the testimony of the experts in handwriting. This fills so large a space in the record, and the conclusions arrived at are based upon so many different and even divergent points and theories, that it would be practically impossible to refer to this branch of the case in detail. It is, moreover, unnecessary for our purposes to do more than to refer to the methods upon which the conclusions of the handwriting experts are based, in order to decide whether error was committed upon this branch of the case. There were fourteen experts, of whom nine were men who had made the study of handwriting a profession, and the remaining five held various positions in banks which required an expert knowledge of signatures. They were all agreed that the defendant wrote the address upon the wrapper of the poison package. For the purpose of arriving at these conclusions they were permitted to use, and rely upon, all of the several writings which have been referred to in the foregoing statement. These writings may be classified as follows: 1. Exhibit "A," known as the poison package address. 2. The so-called "Barnet" letters written in the name of H. C. Barnet. 3. The so-called "Cornish" letters written in the name

of H. Cornish. All of these together consist of Exhibits "A," to "R" inclusive, and are known as the lettered exhibits. 4. The conceded handwritings of the defendant which are known as the numbered exhibits and consist of Exhibits "1" to "63" inclusive. These numbered exhibits include the so-called "request writings" of the defendant and letters conceded to have been written by him. The history of the "request writings," briefly stated, is, that on the 17th day of February, 1899, the defendant, at the request of the police department, wrote in the office of the district attorney, in the presence of Assistant District Attorney Osborne, Mr. Weeks, defendant's counsel, Police Sergeant McCafferty, and the experts Kinsley and Carvalho. It had been planned to have these writings consist of copies of the poison package address (Exhibit "A") and other papers in the case, which were to have been made from typewritten memoranda prepared by Kinsley and by him sent to Mr. Osborne. The latter having mislaid the same, Kinsley dictated from memory and the defendant wrote. The result was not satisfactory to Mr. Kinsley and at his request the defendant, with his counsel, Mr. Weeks, called at the office of Kinsley on the 20th day of February, 1899, and there wrote the "request writings," Exhibits 3, 4, 6, 7, 8, 9 and 10. For the sake of brevity we have omitted from the foregoing statement many details of fact and evidence, besides those relating to the subject of handwriting, because they are not essential to the proper disposition of the principal legal questions in the case. For the same reason we will refrain from discussing many of the minor grounds of error assigned by the defendant, which are so numerous and diversified that a consideration of them, *seriatim,* would only serve to becloud the larger and more comprehensive questions which, according to our views, are decisive of the case.

First in order, if not in importance, is the question whether any evidence was admissible concerning the alleged killing of Barnet. This question may be considered without referring to the specific objections or exceptions of the defense because

it was raised so often and in so many ways that it would involve profitless reiteration and prolixity to dwell upon each objection and exception.

As has been disclosed by the foregoing statement of facts, evidence was received upon the trial tending to connect the defendant with the felonious killing of Barnet, for the purpose of proving his guilt of the crime of poisoning Mrs. Adams, which was the offense charged in the indictment. The general rule of evidence applicable to criminal trials is that the state cannot prove against a defendant any crime not alleged in the indictment, either as a foundation for a separate punishment, or as aiding the proofs that he is guilty of the crime charged. 1 Bishop's New Crim. Pro. sec. 1120. This rule, so universally recognized and so firmly established in all English-speaking lands, is rooted in that jealous regard for the liberty of the individual which has distinguished our jurisprudence from all others, at least from the birth of Magna Charta. It is the product of that same humane and enlightened public spirit which, speaking through our common law, has decreed that every person charged with the commission of a crime shall be protected by the presumption of innocence until he has been proven guilty beyond a reasonable doubt. This rule, and the reasons upon which it rests, are so familiar to every student of our law that they need be referred to for no other purpose than to point out the exceptions thereto. The rule itself has been stated and discussed in this court in a number of cases, but we will cite only a few. In People v. Sharp, 107 N. Y. 427, it was said: "The general rule is that when a man is put upon trial for one offense he is to be convicted, if at all, by evidence which shows that he is guilty of that offense alone, and that, under ordinary circumstances, proof of his guilt of one or a score of other offenses in his lifetime is wholly excluded." In Coleman v. People, 55 N. Y. 81, it is laid down as follows: "The general rule is against receiving evidence of another offense. A person cannot be convicted of one offense upon proof that he committed another, however persuasive in a moral point

of view such evidence may be. It would be easier to believe a person guilty of one crime if it was known that he had committed another of a similar character, or, indeed, of any character; but the injustice of such a rule in courts of justice is apparent. It would lead to convictions, upon the particular charge made, by proof of other acts in no way connected with it, and to uniting evidence of several offenses to produce conviction for a single one." In People v. Shea, 147 N. Y. 78, the rule is thus stated: "The impropriety of giving evidence showing that the accused had been guilty of other crimes merely for the purpose of thereby inferring his guilt of the crime for which he is on trial may be said to have been assumed and consistently maintained by the English courts ever since the common law has itself been in existence. Two antagonistic methods for the judicial investigation of crime and the conduct of criminal trials have existed for many years. One of these methods favors this kind of evidence in order that the tribunal which is engaged in the trial of the accused may have the benefit of the light to be derived from a record of his whole past life, his tendencies, his nature, his associates, his practices, and in fine all the facts which go to make up the life of a human being. This is the method which is pursued in France, and it is claimed that entire justice is more apt to be done where such a course is pursued than where it is omitted. The common law of England, however, has adopted another, and so far as the party accused is concerned, a much more merciful doctrine. By that law the criminal is to be presumed innocent until his guilt is made to appear beyond a reasonable doubt to a jury of twelve men. In order to prove his guilt it is not permitted to show his former character or to prove his guilt of other crimes, merely for the purpose of raising a presumption that he who would commit them would be more apt to commit the crime in question." The highest court of Massachusetts has said: "The objections to the admission of evidence as to other transactions, whether amounting to indictable crimes or not, are very apparent. Such evidence compels the defendant to

meet charges of which the indictment gives him no informa-
tion, confuses him in his offense, raises a variety of issues, and
thus diverts the attention of the jury from the one immediately
before it, and by showing the defendant to have been a knave
on other occasions, creates a prejudice which may cause injus-
tice to be done him." Commonwealth v. Jackson, 132 Mass.
16. The court of last resort in Pennsylvania thus states the
rule: "It is the general rule that a distinct crime unconnected
with that laid in the indictment cannot be given in evidence
against a prisoner. It is not proper to raise a presumption of
guilt on the ground that having committed one crime, the
depravity it exhibits makes it likely he would commit another.
Logically, the commission of an independent offense is not
proof in itself of the commission of another crime. Yet it
cannot be said to be without influence on the mind, for cer-
tainly if one be shown to be guilty of another crime equally
heinous, it will prompt a more ready belief that he might
have committed the one with which he is charged; it, there-
fore, predisposes the mind of the juror to believe the prisoner
guilty." Shaffer v. Commonwealth, 72 Pa. St. 60.

The exceptions to the rule cannot be stated with categorical
precision. Generally speaking, evidence of other crimes is
competent to prove the specific crime charged when it tends
to establish (1) motive; (2) intent; (3) the absence of mis-
take or accident; (4) a common scheme or plan embracing the
commission of two or more crimes so related to each other
that proof of one tends to establish the others; (5) the identity
of the person charged with the commission of the crime on
trial. Wharton on Crim. Ev. 9th ed., sec. 48; Underhill on
Ev. sec. 58; Abbott's Trial Brief, Crim. Trials, sec. 598.

Let us now endeavor to apply to the case at bar each of these
exceptions to the general rule.

First. As to motive.

It is obvious that in every criminal trial when proof of
motive is an essential ingredient of the evidence against a
defendant, the motive to be established is the one which in-

duced the commission of the crime charged. This is too simple for discussion. To hold otherwise would be to sanction the violation of the general rule under the guise of an exception to it. What was the motive assigned for the defendant's alleged attempt to kill Cornish? Hatred, engendered by quarrels between them, in which Barnet took no part, and of which, so far as the record shows, he had no knowledge. What was the motive which is said to have moved the defendant to kill Barnet? Jealousy caused by the latter's intervention in the love affair of the former. The mere statement of these two motives suffices to show that they have no relation to each other and that the evidence which tends to prove the killing of Barnet throws no light upon the motive which actuated the attempt upon the life of Cornish. So apparent, indeed, is this diversity of motive in the two cases that the learned counsel for the People upon the argument herein abandoned the claim that there was anything in common between them and ingeniously sought to create a single motive out of the alleged forgeries by the defendant of the names of Barnet and Cornish. Of course no inference can be drawn from these alleged forgeries without assuming that the "Barnet" and "Cornish" letters were all properly received in evidence and proven to have been written by the defendant. We will, therefore, assume that all of these letters were properly in evidence, that they were written by the defendant, and that he was, therefore, guilty of the crime of forgery in the use of each of these names. Is there anything in any of the Barnet letters which sheds a ray of light upon the question of motive for the attempt to kill Cornish? Not a word. We are at a loss to understand what probative force there is in the "Barnet" letters which does not also inhere in the "Cornish" letters. If the "Barnet" letters were forged, so were the "Cornish" letters. If the latter bore no intrinsic evidence of motive against the life of Cornish this was equally true of the former. It will thus be seen that under no hypothesis, upon no assumption, can the "Barnet" letters

be held to contain any evidence as to the motive for the attempt to kill Cornish that is not also to be found in the "Cornish" letters. What has been said about the "Barnet" letters is true of all the evidence relating to the alleged killing of Barnet. Even if it be admitted that it proves the commission of an independent crime with an adequate motive behind it, it contributes nothing to the subject of motive in the case at bar. Although it seems unnecessary to cite authorities in support of the statement that whenever motive is to be established it must be the motive which underlies the crime charged, we will briefly refer to a few cases which illustrate the rule. In Pierson v. People, 79 N. Y. 424, the defendant was charged with the murder of one W. The alleged motive was defendant's desire to possess the wife of the deceased. On the trial evidence was received to show that eleven days after the death of W. the defendant and the wife of the deceased appeared before a clergyman in Michigan to be married. Defendant there took an oath that there was no legal objection to the marriage. Although this evidence tended to prove the commission, by the defendant, of another crime than that for which he was on trial, this court said, "this evidence tended to prove that the motive which operated upon the prisoner was the desire to possess W.'s wife; that his passion for her was so absorbing that he was determined to overcome all obstacles standing in his way." In Stout v. People, 4 Park. Crim. Cas. 132, the crime charged was murder. On the trial evidence was received of an incestuous connection between the defendant and his sister, the wife of the deceased. This was held to be competent even if it did prove the commission of another crime, for it tended to disclose the motive which prompted the defendant to get rid of the deceased. In Hawes v. People, 88 Ala. 37, the defendant was on trial for the murder of one of his children. Two other indictments were then pending against him for the murder of his wife and another child. Evidence was received to support the theory that the motive for the killing of all was to open the way for a second marriage, which was con-

summated a few days after the last death. This was held proper, because the motive was the same in each case. In People v. Harris, 136 N. Y. 443, the defendant was accused of the murder of his wife. The marriage had been secretly performed. Evidence of abortions, performed upon his wife by the defendant, were held to be admissible to show defendant's efforts to keep the marriage a secret, and as tending to show a motive for the poisoning of the wife when secrecy was no longer possible or the alliance had become burdensome. So, on the trial of a husband for the murder of his wife, evidence of criminal proceedings against the defendant for failure to support his family, made ten months before the murder, was properly held admissible upon the question of motive. People v. Otto, 4 N. Y. Crim. 149. In another case the defendant was charged with the murder of his brother's wife. The brother, his wife and two children were poisoned with arsenic. The brother and his wife died, but the attempt upon the lives of the children failed. Thereupon the defendant procured himself to be appointed the guardian of his brother's children and then commenced to create and utter various false and forged claims against his brother's estate. The theory of the prosecution was that the defendant coveted his brother's estate, and in order to gain possession of it conceived the plan to murder those who stood in his way; that failing in the attempt to kill the children, he attempted to accomplish his object by forgery. It was held that evidence was properly received of all the crimes involved in this theory, as it was relevant upon the existence of motive for the commission of the crime charged. People v. Wood, 3 Park. Crim. Rep. 681. Cases of this character might be multiplied indefinitely, but enough have been cited to show that when evidence of extraneous crimes has been held competent upon the existence of motive, it has been either the specific motive which underlay the particular crime charged, or a motive common to all of the crimes sought to be proved.

Second. As to intent.

In the popular mind intent and motive are not infrequently regarded as one and the same thing. In law there is a clear distinction between them. Motive is the moving power which impels to action for a definite result. Intent is the purpose to use a particular means to effect such result. When a crime is clearly proven to have been committed by a person charged therewith, the question of motive may be of little or no importance. But criminal intent is always essential to the commission of crime. There are cases in which the intent may be inferred from the nature of the act. . There are others where willful intent or guilty knowledge must be proved before a conviction can be had. Familiar illustrations of the latter rule are to be found in cases of passing counterfeit money, forgery, receiving stolen property and obtaining money under false pretenses. An innocent man may, in a single instance, pass a counterfeit coin or bill. Therefore, intent is of the essence of the crime, and previous offenses of a similar character by the same person may be proved to show intent. Commonwealth v. Jackson, 132 Mass. 16; Commonwealth v. Bigelow, 8 Metc. 235; Commonwealth v. Stone, 4 Metc. 43; In re Held, 1 C. H. R. 46; In re Smith, 1 C. H. R. 49; In re Coffee, 1 C. H. R. 52; In re Dougherty, 4 C. H. R. 166. So in a case where the defendant is charged with having received stolen property, guilty knowledge is the gravamen of the offense and *scienter* may be proven by other previous similar acts. Commonwealth v. Johnson, 133 Pa. St. 293; Coleman v. People, 58 N. Y. 555; Copperman v. People, 56 N. Y. 591; People v. McClure, 148 N. Y. 95. In cases of alleged forgery of checks, etc., evidence is admissible to show that at or near the same time that the instrument described in the indictment fas forged or uttered the defendant had passed, or had in his possession, similar forged instruments, as it tends to prove intent. Commonwealth v. Russell, 156 Mass. 196; People v. Everhardt, 104 N. Y. 591; Rex v. Colclough, 15 Cox. Crim. Cas. 92. On the trial of an indictment for obtaining goods by false

representations, similar representations made by the defendant to creditors from whom goods had been previously purchased by him were held admissible to prove intent. Mayer v. People, 80 N. Y. 364. It will be seen that the crimes referred to under this head constitute distinct classes in which the intent is not to be inferred from the commission of the act and in which proof of intent is often unobtainable except by evidence of successive repetitions of the act.

The intent ascribed to the defendant in the alleged killing of Mrs. Adams was to kill Cornish. This is precisely the same as though he had succeeded in committing the particular crime he had planned. If A undertakes to kill B, and in the attempt kills C, the crime committed is no less a murder than it would have been if B had been killed. The agency employed to encompass the death of Cornsh was cyanide of mercury, a poison so rare and deadly that it is not kept on sale in places where strychnine, arsenic and other poisons are sold. It was disguised in an effervescent salt called "bromo seltzer" which is a much used remedy for headache and other trifling human ills. The bottle containing this mixture was carefully prepared to create the impression that it contained nothing but the harmless "bromo seltzer." It was accompanied by a silver bottle holder into which the bottle fitted. Both of these articles were inclosed in a box of the kind used in the sending of gifts. An empty card envelope was added to create the impression that it was a gift, and that the sender had forgotten to inclose his card. It was sent by mail on the eve of Christmas when, according to the universal custom of this country, gifts are exchanged in this manner, and when even the most cautious and prudent person might have taken counsel of his generosity rather than his suspicions. Could such a foul and cunningly devised act have been innocently done? Could proof of any number of repetitions of this act add anything to the conclusive inference of criminal intent which proof of the act itself affords? Can it be possible that in the face of such irrefragable indicia of murderous intent it is still neces-

sary or proper to prove the commission of other similar crimes to establish intent? These questions carry their own answers. If intent may not be inferred from such an act as this, then there is no such thing as inference of intent from the character of the act. Let us suppose this to be a case in which evidence of felonious intent could properly be derived from proof of the commission, by the defendant, of other similar crimes. The supposition necessarily implies the establishment of the extraneous crime, by legal and competent evidence, before it can be referred to in support of the theory that it proves the guilty intent with which the crime charged was committed. We shall have occasion to show further on that this cardinal essential is lacking in the evidence which relates to the death of Barnet, and that there is no competent evidence in the case which connects the defendant with the sending of the poison to Barnet. But assuming, for present purposes, that there is competent evidence which tends to show that the defendant was the sender of the poison in both instances, how does the sending of poison to Barnet prove the intent with which the poison was sent to Cornish? It is to be remembered that we are now dealing solely with the subject of intent and not with the rebuttal of possible mistake or accident. In this connection it is also to be borne in mind that the practice of receiving evidence of other offenses, to prove intent in cases of passing counterfeit money, etc., is a departure from the usual rules of criminal evidence, justified and necessitated by the peculiar nature of these crimes. A man may innocently pass counterfeit money. For this reason evidence of other similar acts by the same person, although not conclusive, may be received to establish intent. It is true that a person may innocently poison another, but that possibility will be discussed under the appropriate head of accident and mistake. Eliminating these latter factors from the inquiry, there can be no such thing as innocent poisoning. We have, then, two cases of poisoning as separate and distinct as two cases of shooting. Could it be successfully urged that the shooting of one person by another could be proved to show

the intent with which the latter shot a third person at a different time and for a distinct cause? Certainly not, unless it were also established that the two shootings were so connected in time, place and circumstance as to make them part of one common plan or design. The latter subject will also be further discussed under its appropriate head. Throughout the length and breadth of the testimony relating to the death of Barnet there is not a suggestion or a fact which throws any light upon the intent with which the poison was sent to Cornish, or which serves to support or strengthen the inferences as to intent which may be drawn from the evidence tending to show that the defendant sent the poison to Cornish.

Third. As to the possibility of mistake or accident, or doubt as to the cause of death.

There are cases in which the possible or probable defense of accident or mistake may be rebutted upon the direct case of the prosecution; or in which the doubtful cause of the particular death may be established by other previous similar deaths. As most of these are poisoning cases they are of special interest and importance here. The fact that the earlier English reports are more prolific in such illustrations than all of our modern reports is probably explained by the great progress in medical science which has not only materially reduced the number of deaths from poisoning by mistake or accident, but has practically annihilated the possibility of death from poisons so subtle and obscure as to baffle investigation. In Regina v. Gardner and Wife, 3 Foster & Finl. 681, the prisoner Gardner had been previously married, and his former wife had died in March, 1861. Prior to that date his second wife had been a servant in the house. The prisoner's mother resided with him after the second marriage. The mother's death occurred in December, 1861, and it was clearly proved that she died from arsenical poisoning. Gardner, who dealt in milk, also sold arsenic for agricultural purposes. There was evidence of the administration, by the prisoner, to the deceased, of articles of diet in which arsenic might be concealed and of the symptoms of

poisoning which followed.    But there was also evidence that
three horses, one of them belonging to Gardner, had been poi-
soned by arsenic, and that some of his customers against whom
he harbored no ill-will had shown symptoms of arsenical poi-
soning.    To prove the willful administration of the poison to
Gardner's mother, and to rebut the theory of accident, it was
held proper to receive evidence as to the circumstances of his
former wife's death.    In Regina v. Cotton, 12 Cox's Crim. Cas.
400, the defendant was charged with poisoning her stepchild,
the son of her deceased husband, who was insured for her bene-
fit.    Shortly before his death the child had been attended by
a parish doctor, who had prescribed morphia, prussic acid and
bismuth in medicinal doses.    It was shown that the doctor
kept prussic acid, bismuth and arsenic in separate bottles on the
same shelf.    The bismuth was in the form of sub-carbonate
of bismuth, which, the doctor said, was sometimes adulterated
with arsenic, but only in minute quantities.    It also appeared
that shortly before the death of the child a mixture of soft soap
and from four to six drachms of arsenic had been used for
cleansing furniture and certain parts of the house.    There was
testimony tending to show that when this mixture was dried
by exposure to the air it would release particles of the arsenic,
amounting to three hundred grains, which would float about
in the room and could be inhaled and absorbed into the system
by means of the lungs, but not through the stomach.    Under
these circumstances evidence was offered by the prosecution and
received by the court to show that two other children of the
defendant and one Mattrass, a lodger, had died within a few
months of each other with symptoms of arsenical poisoning;
that their bodies had been exhumed and arsenic had been found
in the organs of each of them.    The evidence was received on
the authority of Regina v. Geering, 18 L. J. Mag. Cas. 215,
where the defendant was tried for the murder of her husband,
the cause of whose death was not free from doubt.    Three sons
had died at about the same time, all exhibiting the same symp-
toms.    The court held that evidence of the other three deaths

was competent to show that all were due to arsenical poisoning, and the domestic history of the family was admissible to enable the jury to determine whether the poisoning was accidental or not. In Regina v. Heesom, 14 Cox's Crim. Cas. 40, the defendant was charged with the murder of her child by poison on October 3, 1877, and also with the murder of her mother by the same means on November 5, 1877. She was indicted for both offenses. On the trial for the murder of her child evidence was received to show that she had poisoned her mother and another of her children. It appeared that the accused held insurance upon the lives of the three alleged victims. The court, after some hesitation, admitted evidence as to the two previous deaths, citing Regina v. Geering as authority, and saying, " If there had been no case on the point I would have paused to consider whether the evidence could be received; but after the decision quoted and with which I am quite satisfied, I have no doubt that it is competent to show that the death of the child was not due to the accidental taking of arsenic." In Mackin v. Attorney-General of New South Wales, 17 Cox's Crim. Cas. 704, the defendant, who kept a " baby farm," was indicted for the murder of an infant, Horace Murray. The Murray child was found buried in a garden attached to defendant's house. The bodies of other children were found buried in the same garden and the gardens attached to other houses previously occupied by the defendant. Here, again, the authority of Regina v. Geering, supra, was invoked and evidence of other similar deaths was received. In Regina v. Roden, 12 Cox's Crim. Cas. 630, the defendant was indicted for the murder of her child, an infant nine days old, whose death was caused by suffocation while he was in bed with his mother. The defense was accident. To rebut this defense testimony was received to show that five other children of the defendant had all died in infancy. The prisoner was acquitted, however, upon the testimony of a physician, who said the child might have been accidentally suffocated by the mother overlaying it or by the covering on the bed. In Regina v. Flannagan and

Higgins, 15 Cox's Crim. Cas. 403, the defendants, who were sisters, were indicted for murdering the husband of the defendant Higgins by arsenical poisoning.    The defendants had also been indicted for the murder of Margaret Jennings, John Flannagan and Mary Higgins, apparently members of the same family.    Evidence of the previous deaths was received "with a view of showing, not that the defendants had feloniously poisoned the deceased, but that the deceased had, in fact, died by poison administered by some one."    In Zoldoske v. State, 82 Wis. 581, the defendant was indicted and prosecuted for the murder of one Ella Maly, who died of strychnine poisoning. The evidence tended to show that the defendant was enamored of Dr. Mitchell, in whose family she lived as a servant, and was jealous of his attentions to Maly.    Evidence was received to show the circumstances of Mrs. Mitchell's death, which occurred prior to the death of Maly, for the purpose of showing that the latter was not accidental.    In the case of Goersen v. Commonwealth, 99 Pa. St. 388, the defendant was accused of causing the death of his wife by arsenical poisoning.    On the trial evidence of the death of the wife's mother was admitted to show that arsenic has been administered to both of them in pursuance of a design on defendant's part to obtain their property.    This evidence was held to be competent to show the defendant's purpose and intent, the system by which that purpose was to be accomplished, and also to rebut the theory of accident, suicide or the negligent or ignorant administration of arsenic either by the defendant or his wife.    In People v. Seaman, 107 Mich. 348, on prosecution for manslaughter in committing an abortion, where the proof of the killing was circumstantial, and the theory of the defense was that the premature birth was due to accidental causes, it was held proper to receive evidence that the respondent had performed other abortions in the same house. There are other cases of similar character in which this kind of evidence was not received.    These will not be referred to as our only purpose in citing the foregoing authorities under this head is to show the radical difference between the cases which

must be relied upon by the prosecution and the case at bar. While the early English cases have gone to great lengths in the admission of testimony tending to establish other crimes than the one charged, it is clear that the only two theories upon which the rulings therein have been attempted to be, or could be defended are, first, that the killing may have been accidental, or, second, that the cause of death was in doubt. In the one instance proof of other deaths in the same family, under similar circumstances and identical symptoms, may have been the only evidence obtainable to prove a felonious killing; in the other instance the uncertainty as to the cause of death could, possibly, have been removed by evidence of previous deaths in the same family circle, under conditions which would make the cumulative evidence of all the deaths cogent proof of the cause of the particular death charged in the indictment. No such case is presented here. The poison used is clearly and positively identified. The analyses of the contents of the bromo seltzer bottle, the glass from which a portion thereof was taken by the victim and of her internal organs, point unerringly to the swift and terrible agent of death employed by the murderer. The poison is rare, subtle, deadly. It is mixed with a harmless powder of common use, contained in a bottle, labeled and prepared with the design to deceive the recipient. It is accompanied by other articles calculated to induce the belief that they are component parts of a gift from a friend. It is sent by mail on the eve of that great holiday when the spirit of generosity and good will pervades the land; when friendships are renewed and enmities are forgotten; when distrust and suspicion are allayed by the higher and kindlier impulses of human nature. Was this poison sent by mistake or accident? Are not utter depravity, venomous malignity, murderous design, fiendish cunning, indelibly stamped upon every fact and circumstance connected with the act? It would be a travesty upon our jurisprudence to hold that, in a case of such appalling and transparent criminality, it could ever be deemed necessary or proper to resort to proof of extraneous crimes to anticipate

the impossible defense of accident or mistake.    The same irre-
futable logic of fact and circumstance that establishes felonious
intent as clearly negatives the possibility of accident or mistake.

Fourth. As to a common plan or scheme.

It sometimes happens that two or more crimes are committed
by the same person in pursuance of a single design or under
circumstances which render it impossible to prove one without
proving all.    To bring a case within this exception to the gen-
eral rule which excludes proof of extraneous crimes, there must
be evidence of system between the offense on trial and the one
sought to be introduced.    They must be connected as parts of a
general and composite plan or scheme, or they must be so re-
lated to each other as to show a common motive or intent run-
ning through both.    Underhill in his work on Criminal Evi-
dence, section 88, thus states this exception to the general rule :
" No separate and isolated crime can be given in evidence.    In
order that one crime may be relevant as evidence of another,
the two must be connected as parts of a general and composite
scheme or plan.    Thus the movements of the accused prior to
the instant of the crime are always relevant to show that he was
making preparations to commit it.    Hence, on a trial for
homicide, it is permissible to prove that the accused killed an-
other person during the time he was preparing for or was in
the act of committing the homicide for which he is on trial.
And, generally, when several similar crimes occur near each
other, either in time or locality, as, for example, several bur-
glaries or incendiary fires upon the same night, it is relevant
to show that the accused, being present at one of them, was
present at the other if the crimes seem to be connected.    Some
connection between the crimes must be shown to have existed
in fact and in the mind of the actor, uniting them for the ac-
complishment of a common purpose, before such evidence can
be received.    This connection must clearly appear from the
evidence.    Whether any connection exists is a judicial ques-
tion.    If the court does not clearly perceive it, the accused
should be given the benefit of the doubt and the evidence re-

jected.    The minds of the jurors must not be poisoned and prejudiced by receiving evidence of this irrelevant and dangerous description." The compendium just quoted, of the exception now under discussion, is so accurate and concise that no other text writers will be cited, although there are many of them.    There is, indeed, no room for discussion in regard to the general principles upon which evidence is admitted to show that a defendant is guilty of other felonies or misdemeanors than the one upon which he is tried.    As stated in People v. Sharp, 107 N. Y. 467, " whether the evidence in any particular case comes within the well known exceptions to the general rule is often the difficult question, and not as to what the rule itself really is."

Before adverting to the facts and circumstances upon which the prosecution rests its claim that there is such a connection between the alleged killing of Barnet and the killing of Mrs. Adams as to justify proof of the former in support of the latter, we will pursue the course hitherto adopted in citing some authorities upon which the prosecution rely and which illustrate and limit the exceptions to the general rule.    In Goersen v. Commonwealth, supra, the deaths of the defendant's mother-in-law and wife, respectively, were connected by evidence tending to show defendant's design to obtain possession of their property.    There was a single motive, intent and purpose.    In Hester et al. v. Commonwealth, 85 Pa. St. 139, which is known as one of the " Molly Maguire " cases, the defendants were on trial for a murder which had been preceded by a highway robbery in which they were implicated.    Evidence was received to show that the defendants were members of a secret society which had for its object the commission of various crimes, such as beatings, arsons, robberies and murders, and the protection of its members from arrest and punishment by secreting them, aiding them to escape and otherwise.    This was held to be competent to show that the crime charged was within the scope of the purposes for which the conspirators were banded together and to explain and corroborate other testi-

mony which bore directly upon the commission of the crime charged.     In People v. Zucker, 20 App. Div. 363; affd., 154 N. Y. 770, the crime charged was arson in the first degree for burning a building in New York city.     It appeared that in August, 1891, the defendant had a house in New York city containing some furniture.     The furniture was removed to a house in Newark, N. J.     The defendant stated to an accomplice, who was a witness for the prosecution, that his object in removing the furniture was to have it insured in the name of Selzer, because he, the defendant, had been blacklisted by the insurance companies and could not get it insured in his own name.     On January 4, 1892, the house in New York was burned, and a few days before that the furniture in Newark had also been burned.     It was held that evidence in respect to the Newark fire was competent upon the ground that both arsons were perpetrated with a single object and motive and in pursuance of the same plan.     The court said: "Where one crime is committed to prepare the way for another, and the commission of the second crime is made to depend upon the perpetration of the first, the two become connected and related transactions, and the proof of the commission of the first offense becomes relevant to show the motive for the perpetration of the second."     In Hope v. People, 83 N. Y. 418, the defendant was indicted and tried for the crime of robbery in the first degree. The evidence disclosed that a number of masked men entered the apartment of the janitor of a bank and forcibly took from him the key of the bank.     The bank was burglarized on the same occasion.     The two crimes were held to be so connected that evidence of the burglary was deemed competent to connect the defendant with the robbery.     In People v. Murphy, 135 N. Y. 451, the defendant was convicted of the crime of arson in the third degree.     The specific charge was that defendant had burned a barn belonging to the man by whom he had been employed as coachman and gardener.     The defendant had been discharged from this position.     A poisonous preparation had been kept in the barn for use in destroying insects in the garden.

The defendant knew of this.    Evidence was received to show that on the night of the fire and before it occurred, a span of horses, a pony and a cow had been poisoned and died.    This evidence was held competent as tending to prove that the injury to the animals was done by the incendiary and as a part of the same criminal scheme which resulted in the destruction of the barn.    In Kramer v. Commonwealth, 87 Pa. St. 301, the defendant was convicted of arson in attempting to burn a hotel of which he had been an inmate.    The evidence, which was circumstantial, pointed to the defendant as the guilty person. Evidence was offered and received to show that two days after the first attempt, which had proved abortive, the defendant was apprehended with combustible materials in his possession, under circumstances which strongly indicated a second attempt at burning the hotel.    The evidence was held to be competent to show a renewed purpose to accomplish the crime previously attempted and to identify the person who made both attempts. In approving of this ruling the court quoted with approval the statement in Shaffner v. Commonwealth, 72 Pa. St. 63, that " to make one crime evidence of another a connection between them must have existed in the mind of the actor, linking them together for some purpose he intended to accomplish; or it must be necessary to identify the person of the actor by a connection which shows that he who committed the one must have done the other."    There are other cases where two or more crimes are so connected that it is impossible to distinguish them and proof of all, in the effort to establish one, is a part of the *res gestae*.    Illustrations of this class will be found in Brown v. Commonwealth, 76 Pa. St. 319, in which defendant killed a man and his wife, at the same time and place, under circumstances showing that both were committed by the same person; and in People v. Foley, 64 Mich. 148, where the defendant murdered his two children in the same bed and at the same time.

Without further multiplying the cases which exemplify and support the exception to the general rule, that extraneous

crimes may be proven to establish the specific crime charged, when all are shown to have been committed in pursuance of a common design, or when they are so connected that evidence of one tends to prove the other, we will now quote from a single authority which clearly and succinctly prescribes the limitations of this exception and the reasons for careful judicial discrimination in its application. In Shaffner v. Commonwealth, supra, the highest court of Pennsylvania said. " To make one criminal act evidence of another, a connection between them must have existed in the mind of the actor linking them together for some purpose he intended to accomplish; or it must be necessary to identify the person of the actor by a connection which shows that he who committed the one must have done the other. Without this obvious connection it is not only unjust to the prisoner to compel him to acquit himself of two offenses instead of one, but it is detrimental to justice to burden a trial with multiplied issues that tend to confuse and mislead the jury. The most guilty criminal may be innocent of other offenses charged against him, of which, if fairly tried, he might acquit himself. From the nature and prejudicial character of such evidence it is obvious it should not be received, unless the mind plainly perceives that the commission of one tends, by visible connection, to prove the commission of the other by the prisoner. If the evidence be so dubious that the judge does not clearly perceive the connection, the benefit of the doubt should be given to the prisoner instead of suffering the minds of the jurors to be prejudiced by an independent fact, carrying with it no proper evidence of the particular guilt." This statement voices the key note of the distinction between the civil law and our own more merciful common law. Under the former there is no presumption of innocence. A mere official charge of crime puts the accused upon his defense. His history is an open book, every page of which may be read in evidence by the prosecution. Every crime or indiscretion of his life may be laid bare to feed the presumption of guilt. How different is our own common law, which is the product

of all the wisdom and humanity of all the ages. Under it the accused comes into a court of justice, panoplied in the presumption of innocence, which shields him until his guilt is established beyond a reasonable doubt. His general character can be thrown into the balance by no one but himself. The incidents of his life, not connected with the crime charged, are his sacred possession. He faces his accuser in the light of a distinct charge, with the assurance that no other will be, or can be, proved against him.

Let us now endeavor to make a practical application of these principles to the case at bar, remembering that the subjects of motive, intent, accident and mistake have already been discussed, and that the subject of identity remains for separate consideration. Mrs. Adams was killed on the 28th day of December, 1898. The cause of the latter's death was clearly established by evidence connected with a definite motive and unmistakable intent. The only mistake or accident that was possible did in fact happen. The intended victim innocently administered the poison to another. We are, therefore, to consider whether the killing of Mrs. Adams and the alleged killing of Barnet were part of a common plan or scheme, or were so connected that evidence of the death of Barnet and its cause tended to prove the murder of Mrs. Adams. Barnet died on the 10th day of November, 1898. Subsequent events proved that he died of mercuric poisoning. There was no evidence tending to connect the defendant with the sending of the poison to Barnet, except the inference which may be drawn from the assumption that it was sent by mail, and this assumption is based upon the utterly incompetent statement of Barnet to his physicians. The motive for the alleged killing of Barnet is so distinct from the motive assigned for the crime charged in the indictment that a new and common motive is sought in the alleged forgeries of the defendant, and this, as we have seen, is the creation of counsel upon the argument of the appeal, never having been suggested upon the trial. The motive

against Barnet, exploited upon the trial, was without the support of evidence since a large part of the testimony upon that subject was stricken from the record.     But assuming for present purposes that the prosecution did in fact prove all that it sought to prove, it is impossible to perceive any legal connection between the two cases.     Barnet was said to have been poisoned because he had interfered in the defendant's love affairs. Cornish was to be poisoned because he had incurred the hatred of the defendant as the result of quarrels between them over club matters.     Barnet died November 10th, and Mrs. Adams died seven weeks later.     Let us suppose that the defendant, having a motive for the killing of Barnet, had shot and killed him in November, 1898; and that in darkness of night on the 28th day of December, 1898, some one had shot and killed Mrs. Adams while she was near to Cornish; that in a subsequent investigation it had transpired that defendant also had a different motive for killing Cornish, thus creating the suspicion that the bullet which killed Mrs. Adams had been intended for Cornish, could it be shown that the defendant shot Barnet to prove that he shot Mrs. Adams?     The two deaths were caused by the same means, at different times, inspired by separate motives, and charged against one person.     Is there any connection between the two crimes?

It is said that the connection is established by the " Barnet " and " Cornish " letter box correspondence.     Let us assume for the present that the " Barnet " letters were competent for all the purposes for which they were used.     Referring to the " Barnet " correspondence and its incidents, it appears that the defendant rented a letter box in the name of Barnet. Through it the letters addressed to Barnet were received. There is no suggestion of Cornish in the renting of the box or in any of the communications which passed to and fro in the name of Barnet.     When the defendant undertakes to describe a person who is not Barnet, as it is said he did in the " diagnosis blank," he describes himself.     Seven months later, and six weeks after the death of Barnet, the defendant rents a letter

box in the name of Cornish. This was the medium under cover of which the " Cornish " correspondence was sent and received. Neither in the renting of this box nor in any of the letters addressed to or written in the name of Cornish is there any reference to the Barnet case. Where is the connection between them? It is argued that it exists in the similarity of the methods employed in the two cases and in the identity of the methods employed in the two cases and in the identity of the remedies written for in both names. It is true that " Calthos " and " Kutnow " powder were found among the belongings of Barnet. The same things were found in the letter box agency of Koch, addressed to Cornish, but placed in the wrong box and, therefore, never delivered until given up to the police. What do these things prove? Simply this: that if the same person was operating through both boxes he was employing similar means for different ends or for some common purpose not disclosed by this record. The methods referred to are as identical as any two shootings, stabbings or assaults, but no more so. In this connection it may be well to remember that " Kutnow " powder was not written for in the name of Cornish until the 21st day of December, 1898, the very day on which the bottle holder was purchased which exactly fitted the bottle of " bromo seltzer " containing the poison sent to Cornish. This would indicate that when the " Cornish " letter was written, asking for a sample of " Kutnow " salts, the vehicle had already been chosen for the poison that was to be sent to Cornish. While this fact would not necessarily be inconsistent with the prisoner's efforts to obtain other materials to effect his designs if the " bromo seltzer " should fail, it remains true that whatever was done in December had reference to the death of Cornish and not of Barnet, the latter having died in November. It is also urged that the poison which caused the death of Mrs. Adams was one which could only be secretly and successfully produced and administered by a person who had the requisite knowledge and skill, and, therefore, it was proper to show the use of the same poison in a

previous case.    Other evidence had been properly admitted to show that the defendant had the knowledge, skill, appliances and opportunity to produce the poison used in the Adams case. It is as plain as that two and two make four that the man who could produce it in one case could do so in another.    But the naked fact that the same means were used in the two cases simply proves that two distinct crimes may have been committed by the same person by similar means.    There is not a fact or circumstance in the Barnet case that, taken by itself, legitimately tends to prove any essential fact in the Adams case until we come to the subject of the handwriting of the "Barnet" and "Cornish" letters, and that will be considered under the head of handwriting evidence.

Fifth.  As to identity.

Another exception to the general rule is, that when the evidence of an extraneous crime tends to identify the person who committed it as the same person who committed the crime charged in the indictment, it is admissible.    There are not many reported cases in which this exception seems to have been affirmatively applied.    A far larger number of cases, while distinctly recognizing its existence, have held it inapplicable to the particular facts then before the court.    The reason for this is obvious.    In the nature of things there cannot be many cases where evidence of separate and distinct crimes, with no unity or connection of motive, intent or plan, will serve to legally identify the person who committed one as the same person who is guilty of the other.    The very fact that it is much easier to believe in the guilt of an accused person when it is known or suspected that he has previously committed a similar crime proves the dangerous tendency of such evidence to convict, not upon the evidence of the crime charged, but upon the superadded evidence of the previous crime.    Hence our courts have been proverbially careful to subject such evidence to the most rigid scrutiny, and have invariably excluded it in cases where its relevancy and competency was not clearly shown. As was said in People v. Sharp, 107 N. Y. 471, such evidence

" tends necessarily and directly to load the prisoner down with separate and distinct charges of past crime, which it cannot be supposed he is or will be in proper condition to meet or explain, and which necessarily tend to very gravely prejudice him in the minds of the jury upon the question of his guilt or innocence." Such evidence gives opportunity for the conviction of an accused person upon mere prejudice instead of by evidence showing the actual commission of the crime for which a defendant is on trial. It compels a defendant to meet an accusation not charged in the indictment, which he might successfully refute if given the opportunity to do so, unembarrassed by other issues. Before applying the exception under discussion to the case at bar, let us examine a few authorities which illustrate the theory upon which evidence of previous crimes is admissible to identify the person who is charged with the commission of the crime set forth in the indictment. In People v. Rogers, 71 Cal. 565, the defendant was convicted of a murder committed by him while burglariously entering the house of the deceased. Evidence was received tending to show that the defendant had committed a prior burglary at which he had stolen a knife and chisel, and still another burglary at which he had stolen a pistol. The evidence also tended to show that the burglary at the house of the deceased had been committed by means of the knife and chisel, and that the deceased had been killed with the pistol which the defendant had previously stolen. It will be seen at once that there was such a palpable connection between the several crimes referred to that the identification of the means used in the commission of the crime charged, while incidentally proving the defendant guilty of other crimes, also directly identified him as the person who was guilty of the murder. In Commonwealth v. Choate, 105 Mass. 451, the defendant, a ship joiner, was indicted for burning the buildings of one Ackerman. The charred remains of a box, of peculiar construction and equipment, were found on the ground beside one of these buildings. After the fire the defendant fled from the State. Soon thereafter his shop was

searched and certain tools and materials were found which, upon inspection and comparison, tended to show that the box found at Ackerman's buildings had been made in the defendant's shop from the materials and with the tools that were there. Another box of similar design, material and workmanship had been previously found at a church nearby, under conditions indicating an attempt at incendiarism. Comparison was made between the box first found and a piece of wood in defendant's shop, and it was shown that they had been, originally, parts of the same piece of wood. An anonymous letter which had been sent to the municipal authorities, threatening general incendiarism, was shown to have been written by the defendant. The admission of the evidence relating to the box found at the church was upheld on the ground that " it tended to show that the defendant was possessed of the requisite skill, materials, tools and opportunity to have made the box used at the Ackerman fire," and in connection with said letter, " to show that the defendant made both boxes with the single motive " expressed in the letter. As proof of the crime there charged depended wholly upon circumstantial evidence, the mere finding of the box at Ackerman's buildings was not sufficient to establish either motive or intent. Evidence of other attempts at arson was, therefore, necessary and competent to establish these essential elements of the crime charged. Such evidence was, of course, not rendered incompetent because it also tended to identify the defendant as the person who was guilty of that crime. In Hope v. People, supra, a robbery committed by masked men was followed by burglary of a bank. The janitor of the bank had been robbed of the key thereto by these men. Evidence of the burglary was held proper to identify those known to have been implicated therein with the persons who had committed the robbery. In Rex v. Cluves, 4 Car. & Payne, 354, a nisi prius case, imperfectly reported, there was a question of identity. A. was indicted for the murder of H. The theory of the prosecution was that A. having malice against P., hired H. to murder him; that H. having

committed the murder, but having been detected in the act, A. murdered H. to prevent the discovery of his (A.'s) guilt. In each of the last two cases there was an immediate and direct connection between the crime charged and the extraneous crime proved. It the first case the burglary of the bank, by men who were known, with the key of which the janitor had been robbed, directly identified the burglars as the masked men who but a moment before committed the robbery which was charged in the indictment. In the second case, proof that the defendant hired H. to murder P., and that H. was detected in the act, was cogent evidence that the same man who had hired the assassin had a motive for getting rid of him when his confession seemed imminent. What is there in the evidence of the alleged killing of Barnet that tends to identify the defendant as the person who poisoned Mrs. Adams? Assuming Barnet to have been killed by the defendant, the crime has its own separate motive, intent and plan. This is equally true of the crime charged in the indictment. The mere fact that the two crimes are parallel as to the methods and means employed in their execution does not serve to identify the defendant as the poisoner of Mrs. Adams unless his guilt of the latter crime may be inferred from its similarity to the former. Such an inference might be justified if it had been shown conclusively that the defendant had killed Barnet and that no other person could have killed Mrs. Adams. But no such evidence was given. The evidence tended to show that the defendant had the knowledge, skill and material to produce the poison which was sent to Cornish. But he was not shown to be the only person possessed of this knowledge, skill and material. Indeed, it is common knowledge that there are many such persons. Therefore, the naked similiarity of these crimes proves nothing. It is said that the renting by the defendant of two letter boxes, one in the name of Barnet and the other in the name of Cornish, and the correspondence which passed through them, proves that the man who rented both boxes and carried on the correspondence is the same man who committed both murders. Let us

see how logical this deduction is.    As we have shown, there is nothing in common between the subject-matter of the Barnet correspondence and the Cornish correspondence except the fact that in the main it all relates to advertised remedies for impotence.    There is one letter in each series in which the writer sends for "Calthos."    One "Cornish" letter asks for a sample of "Kutnow" powder.    A box of this powder is found in the "Barnet" letter box and another is found in the "Cornish" letter box.    Assuming Barnet to have been poisoned with cyanide of mercury contained in "Kutnow" powder administered to or taken by him, it is clear that the package found in the "Barnet" letter box did not contain the powder used for that purpose, and it is equally clear that no one is shown to have written for "Kutnow" powder in the name of Barnet.    The "Kutnow" powder found in the "Cornish" letter box could not have been placed there until after the prisoner had decided to use "bromo seltzer" in the Cornish case, for the bottle holder was purchased on the same day that the "Cornish" letter box was rented, and that was seven weeks after the death of Barnet. All that is shown by the character of this correspondence is that defendant used the names of Barnet and Cornish to carry it on and that it related generally to a common subject not connected with either of the alleged murders.    As the contents of none of the letters in the one series contain any reference to or throw any light upon the matters referred to in the other series, it is difficult to understand how the letters in the Barnet series tend to identify the murderer of Mrs. Adams.    As briefly as possible, we have discussed each of the five foregoing exceptions to the general rule in the effort to exclude them, one by one, from application to the case at bar.    If, as we think, we have successfully eliminated each of them, then they are all removed from the case, and it necessarily follows that none of the evidence tending to prove the poisoning of Barnet was relevant or competent to prove the murder of Mrs. Adams.

Before leaving this point it may be added that even if the evidence relating to the death of Barnet were generally com-

petent for the purpose of proving the murder of Mrs. Adams, yet there was fatal error in the admission of the statements made by Dr. Douglass as to what Barnet had told him with reference to receiving the box of "Kutnow powder" by mail. This evidence was clearly incompetent. It may be conceded for the purposes of this discussion that when evidence of an extraneous crime is admissible to prove the crime for which a defendant is on trial, it is not necessary to prove every fact and circumstance relating to the extraneous crime that would be essential to sustain a conviction thereof. But it cannot require serious argument to show that such evidence, to be admissible, must be relevant and competent to the issue on trial. There was, therefore, no competent testimony in the case that Barnet ever received "Kutnow" powder through the mail, and as there was nothing in the "Barnet" correspondence to show that the defendant had ever written for "Kutnow" powder in the name of Barnet or in any other name until the Cornish letter of December 22, 1898, was written, the record is barren of evidence which tends to connect the defendant with the killing of Barnet. At this point it is proper to observe, also, that even if it could have been proper to prove two distinct crimes with separate motives, there was an utter absence of evidence of motive in the Barnet case. The evidence of the witness Rachel Green, to the effect that the defendant and his wife had lived together before their marriage, was stricken out upon the court's own motion, on the ground that the district attorney had not connected it with the defendant nor made it material to the case at bar as he had promised to do. This evidence was, however, not stricken out until it had been in the case a full month, and even then the district attorney was permitted to present the case to the jury precisely as though the evidence had been retained.

As to the evidence of handwriting.

For the purpose of proving that the defendant wrote the address upon the package of poison received by Cornish, the

prosecution offered and the court admitted, as standards of comparison, three classes of writings. The first class consisted of fifty-six specimens of defendant's handwriting gathered from various places and in sundry ways, and conceded by him at the trial to be his genuine handwriting. The second class consisted of the so-called "request writings," seven in number, admitted to have been written by the defendant under the circumstances disclosed in the statement of facts. The third class consisted of nine so-called "Barnet" letters, five "Barnet" envelopes and three so-called "Cornish" letters. These Barnet and Cornish letters, although unlike in many respects, and introduced in part for different purposes, may be classed together in considering the questions arising out of the exceptions taken to the rulings of the court upon the subject of comparison of handwriting.

The facts upon which the prosecution based the charge that the defendant had written the writings of the third class, and the facts necessary to be understood in considering the admissibility of the writings of the second class, briefly recapitulated, are as follows: On the 27th day of May, 1898, the defendant rented a letter box in the name of H. C. Barnet from one Heckman, who kept a private letter box agency at No. 257 W. 42nd street, New York city. The nine "Barnet" letters consist of Exhibits B, C, F, H, I, M, O, P and Q. The envelopes consist of Exhibits $B^2$, J, K, N and R. These letters were addressed to various manufacturers of proprietary medicines for remedies. None of them referred in terms to any fact or circumstance connected with the death of Mrs. Adams. All of these letters are said by the experts to disclose certain peculiarities of handwriting which also appear in the "Cornish" letters, in the poison package address and in the conceded writings of the defendant. One of these, the "diagnosis blank," written in the name of Barnet, is said to describe the defendant and not Barnet. The "Cornish" letters embrace Exhibits D, E and G. Exhibit D is one addressed to Stearns & Co., asking for information about Harpster. Exhibit E is

a letter to Kutnow Bros., asking for a sample of salts, and Exhibit G is the letter to Van Mohl & Co., asking for "five days' trial." As we have seen, these three letters were written upon the egg-blue, tri-crescent paper, which was also used in writing the "Burns" letter (Exhibit 2), which paper was of the same character and description as that seen by the witness Melando in the drawer of the sideboard in the defendant's room at the Harmann factory in Newark. The second class consists of the so-called "request writings," embracing Exhibits 3, 4, 6, 7, 8, 9 and 10, written by the defendant in the presence and at the suggestion of Kinsley, the handwriting expert who had been retained by Capt. McClusky as early as the 1st day of January, 1899. The admission by the trial court of these standards of comparison raises interesting and important questions which will be considered in their order.

The first point made by the defendant is that comparison of the address upon the poison package could not be made with any other writings whatever under the statutes regulating the subject in this State. When the genuine writings of the defendant, known in the case as the "conceded writings," were offered by the prosecution as standards of comparison, the defendant objected to them upon the ground that comparison of handwriting is competent only in a case in which the disputed writing is the subject-matter of the issue to be tried, and never when it is only evidentiary; in other words, that comparison may be made when the disputed writing is the fact in issue, but not when it is merely a fact relevant to the issue. The disposition of this objection goes to the foundation of the People's case, and requires a statement of the rule at common law and of its statutory modifications.

There is some difference of opinion among the highest courts of the several States concerning the extent to which comparison of handwritings may be made at common law. The rule long established in England, which was adopted in this State and existed until the enactment of the statute of 1880, was briefly this: Whenever it was relevant, according to the gen-

eral rules of evidence, to prove that any person had or had not written a particular paper, such proof might be made either (1) by witnesses who had seen the paper written, or to whom it had been acknowledged, or (2) by witnesses familiar with the handwriting of the person charged to be the writer, and who were able to testify from their familiarity with his handwriting to a belief respecting the genuineness of the handwriting in question, or (3) by what has come to be known as comparison of hands, which could be made at common law by witnesses, or by the court or jury without the aid of witnesses, between the disputed writing and other writings already in evidence for other purposes. It has often been pointed out that the second class of evidence above mentioned is, equally with the third, a comparison of hands, for in the second class the witnesses compare the disputed writing with a standard or exemplar present in their own minds. It has never been doubted, however, that the second class of evidence was admissible whenever, within the accepted rules of evidence, it became relevant to determine whether a particular person wrote a disputed paper. The third class, consisting of direct comparison made by or in the presence of the tribunal charged with the determination of the fact, was limited in England and in this State to comparison between documents properly in evidence for other purposes. Comparison might be made between such documents and the disputed writing in order to determine whether the writer of the other documents was also the writer of the disputed paper; but that was the extent of the rule. No document could be introduced merely as a standard of comparison with the disputed writing. Doe v. Newton, 5 Ad. & El. 514; Doe v. Suckermore, 5 Ad. & El. 703; Van Wyck v. McIntosh, 14 N. Y. 439; Dubois v. Baker, 30 N. Y. 355; Randolph v. Loughlin, 48 N. Y. 456; Miles v. Loomis, 75 N. Y. 288.

It will be seen, upon an examination of the decisions establishing the common law rule in England and in this State, that the idea that a disputed writing must be the very fact in issue

in order that comparison may be made between it and other writings already properly in evidence for other purposes than comparison, finds no support in the rule itself, or in any of the reasons which led to the formulation of that rule.     If it has any foundation it must be in the statutes regulating the subject of comparison of handwriting.

The first statute in this State upon the subject is chapter 36 of the Laws of 1880, entitled "An act to amend the law of evidence and practice on civil and criminal trials," and is as follows:     "Section 1. Comparison of a disputed writing, with any writing proved to the satisfaction of the court to be genuine, shall be permitted to be made by witnesses in all trials and proceedings, and such writings and the evidence of witnesses respecting the same may be submitted to the court and jury as evidence of the genuineness, or otherwise, of the writing in dispute.

"Section 2. This act shall take effect immediately." ·

It is obvious that the purpose of this enactment was to enlarge and not in any wise to narrow the rule established at common law.     The latter was generally felt to be too inelastic, as it frequently excluded from the consideration of the court testimony which common experience proved to be helpful.     As early as 1854 the restrictions of the common law rule had been thrown off in England by statute.     17 & 18 Vict., chap. 125, secs. 27, 103; 28 Vict., chap. 18, secs. 1, 8.

The statute of 1880 is almost verbatim like the English statute of 1854.     So far as our research has gone we have been unable to find any suggestion that the statute was intended to limit comparisons which, at common law, could be made concerning any writing relevant to the issue to writings which were themselves facts in issue, except a dictum presently to be noticed.     Such a construction cannot be given the statute without assuming that the legislature, while intending to broaden the common law rule, actually made it much narrower.

The statute of 1880 was first considered by this court in Peck v. Callaghan, 95 N. Y. 73.     That was an appeal from

a decree admitting a will to probate.    The questions before this court were whether the surrogate had properly admitted genuine specimens of the testator's handwriting to be used by expert witnesses as standards with which to compare the signature to the will, and had properly rejected specimens of the writing of a person charged to have forged the will.    This could held that the rulings were clearly right under the statute. RUGER, Ch. J., said: "This act was evidently intended to enlarge the rules of evidence and extend the facilities for testing the handwriting of a party, the genuineness of whose signature was disputed, beyond the opportunities afforded by the then existing rules." (p. 75.)    The learned chief judge, in the following paragraph, added a sentence which appears to be the foundation of the defendant's argument against the admissibility of the comparisons made in the case at bar between the "conceded writings" and the address upon the poison package, namely: "The disputed writing referred to in the statute relates only to the instrument which is the subject of controversy in the action, and the specimens of handwriting admissible thereunder are those of the person purporting to have executed the instrument in controversy." (p. 75.) This is a slender foundation for the defendant's argument.    The observation made by the learned judge must be confined to the facts before the court; further than that it was unnecessary to the decision and not binding upon the court.

The decision in Peck v. Callaghan was made in 1884, and in 1888 the legislature, evidently in order to avoid the construction confining the standards of comparison to the genuine handwriting of the person purporting to have executed the disputed instrument, enacted chapter 555 of the Laws of 1888, which is as follows: "Section 1. Section 2 of chapter 36 of the Laws of 1880, entitled 'An act to amend the law of evidence and practice on civil and criminal trials,' is hereby amended so as to read as follows:

"Section 2. Comparison of a disputed writing with any writing proved to the satisfaction of the court to be the genuine

handwriting of any person, claimed on the trial to have made or executed the disputed instrument, or writing, shall be permitted and submitted to the court and jury in like manner. But nothing within contained shall affect or apply to any action or proceeding heretofore commenced or now pending.

" Section 2. This act shall take effect immediately."

The Act of 1888 does not repeal or supersede the act of 1880, but enlarges the operation of the latter by admitting evidence of the kind which it was thought had been decided in Peck v. Callaghan to be inadmissible under the statute of 1880.     In other words, it authorized evidence which would establish forgery of the disputed writing by a particular person.     We see nothing in either of the statutes which have been quoted to justify the construction attempted to be placed upon them by the defendant, while the whole history of the subject at common law and under the statutes of Great Britain and this State requires the contrary view.

The precise question appears never to have been decided in any of the courts of this State, probably for the reason that the bar have deemed the statutes too plain to warrant so fanciful a construction as the defendant's counsel attempts to give them here.     We think it too clear for extended argument that the " disputed writing " referred to by the statutes is any writing which one party upon a trial seeks to prove as the genuine handwriting of any person, and which is not admitted to be such, provided that the writing is not inadmissible under other rules of evidence.     The statutes were clearly intended to remove the restriction which at common law limited the comparison of a disputed writing, either with other writings put in evidence for other purposes than comparison, or with standards existing in the minds of witnesses familiar with the handwriting of the person sought to be charged with the disputed writing.     The class of disputed writings which may be proved upon the trial of an issue has neither been enlarged nor restricted.     The admissibility of such disputed writings depends upon other rules than either the common law or the

statutory rules respecting comparison of handwriting. If a disputed handwriting is itself either a fact in issue, or a fact relevant to the issue, it may be proved by the means pointed out by the statutes. If it is neither in issue nor relevant to the issue it must be excluded, not because the statutes of 1880 and 1888 have anything to do with the question, but because, according to fundamental rules, it can have no bearing upon the controversy.

Although similar statutes are in force in several of the States, no such construction as is contended for by the defendant here has ever been suggested, so far as we have been able to ascertain. In this connection it is significant that comparisons between disputed writings merely evidentiary in character and accepted standards have been sanctioned in a number of cases before this court, some of which have passed its scrutiny although it had the power of correcting errors not pointed out by exceptions. Sudlow v. Warshing, 108 N. Y. 520; McKay v. Lasher, 121 N. Y. 477; Dresler v. Hard, 127 N. Y. 235; People v. Sliney, 137 N. Y. 570; Mutual Life Ins. Co. v. Suiter, 131 N. Y. 557.; People v. Corey, 148 N. Y. 476; People v. Kennedy, 164 N. Y. 449.

It is, of course, beyond dispute that the People's Exhibit A, the address upon the poison package, is an important link in the chain of evidence tending to connect some person with the killing of Mrs. Adams. It is a fact relevant to the issue, the fact in issue being whether the defendant killed Mrs. Adams. The defendant's contention is that if he were on trial for having forged Exhibit A (were such a thing possible), then Exhibit A would be the fact in issue and might be compared with the "conceded writings" in order to establish the charge that the defendant wrote Exhibit A. But, since the fact in issue is the defendant's responsibility for the death of Mrs. Adams, and Exhibit A is only a link in the chain tending to connect him with the death, no such comparison can be resorted to. We think we have demonstrated the fallacy of this argument and have already given it more space than it merits.

Another objection made by the defendant at the trial to the standards of comparison admitted by the court was the so-called " request writings." The circumstances in which those writings were made by the defendant have already been detailed. We are of the opinion that it was not error to receive them in evidence. When they were produced the inquest into the circumstances of Mrs. Adams' death was in progress. The defendant was suspected, as he knew, of being the murderer, and was under subpoena to testify at the inquest. Nevertheless, he was not in custody, nor had a formal charge been made against him. It is strongly urged upon us that, owing to the publicity of the case and the known suspicion of the police and prosecuting authorities against the defendant, he could not safely have refused Kinsley's request to produce specimens of handwriting; that such refusal would have subjected him to criticism; that it would have augmented suspicion in the public mind and incited the attacks of certain newspapers which appear to have tried the case to their own satisfaction without awaiting the more tedious processes of the law. But the court cannot admit the argument. The defendant had the legal right to refuse to write for Kinsley. He preferred to accede to the latter's request, and we can discover no ground upon which the writings thus produced can be excluded from the case. If, as we have held in another part of this opinion, the defendant's testimony at the coroner's inquest, which he attended under subpoena and where he was obliged to choose between claiming his privilege against self-incrimination and testifying fully, is admissible, a fortiori these " request writings " are competent.

Writings created post litem motam are inadmissible in favor of a party creating them. Chamberlayne's Best on Ev. 236; Hickory v. U. S., 151 U. S. 303. But we have found no case holding that such writings should be excluded when offered by the adverse party, except R. v. Crouch, 4 Cox's Crim. Cas. 163, which was decided before the English statute of 1854, and

Hynes v. McDermott, 82 N. Y. 41, in which the decision, although made after the passage of our own statute of 1880, was based upon the law as it stood when the controversy arose. It is to be observed, moreover, that in the latter case there were peculiar facts which would have justified the exclusion of the writings there offered in evidence even if the statute had been in existence when the action was commenced.

The third objection made by the defendant to the standards of comparison adopted at the trial is to the admission of the " Barnet " letters and " Cornish " letters.    The " Barnet " letters were undoubtedly admitted in the first instance to support the charge that the defendant had killed Barnet, and the " Cornish " letters to sustain the charge that he murdered Mrs. Adams.    Both were subsequently treated as evidence tending to connect the defendant with each of the crimes said to have been committed by him.    All of these letters were also used as standards of comparison from which to determine who wrote the poison package address.    They may, therefore, be considered together for the purpose of review under this head. The statutes of 1880 and 1888 provide that the comparison of a disputed writing may be made with any writing proved to the satisfaction of the court to be genuine.    The words " proved to the satisfaction of the court " are to be construed in the light of the obvious purpose for which these statutes were enacted. At common law a paper properly in evidence for general purposes can be compared with a disputed writing, but only when the genuineness of the handwriting of the former is admitted or proved beyond a reasonable doubt.    Chamberlayne's Best on Ev. 239; Doe v. Newton, 5 Ad. & El. 514; 1 Greenleaf on Ev. (14th ed.) 578; Miles v. Loomis, 75 N. Y. 288; State v. Scott, 45 Mo. 302; Moore v. U. S., 91 U. S. 270.    Since these statutes were designed to amplify and broaden the common law rule by permitting the use of genuine writings as standards of comparison, even when they are not competent or relevant for other purposes, it must be assumed that the language prescribing the manner in which the genuineness of such writings

is to be established was carefully and deliberately chosen by the Legislature. While it is obvious that the words "proved to the satisfaction of the court" do not invest the trial court with a mere personal discretion which is to be exercised without reference to rules of evidence, it is equally plain that the failure of these statutes to prescribe the precise method or degree of proof necessary to establish the genuineness of a writing for purposes of comparison with a disputed writing renders it necessary to resort to the general rules of the common law for that purpose. Thus the genuineness of a writing may be established (1) by the concession of the person sought to be charged with the disputed writing made at or for the purposes of the trial, or by his testimony; (2) or by witnesses who saw the standards written, or to whom, or in whose hearing, the person sought to be charged acknowledged the writing thereof; (3) or by witnesses whose familiarity with the handwriting of the person who is claimed to have written the standard enables them to testify to a belief as to its genuineness; (4) or by evidence showing that the reputed writer of the standard has acquiesced in or recognized the same, or that it has been adopted and acted upon by him in his business transactions or other concerns.

Since common law evidence is competent to establish the genuineness of a writing sought to be used as a standard of comparison, it is apparent, in the absence of a statutory rule as to the degree of proof to be made, that the general rule of the common law as to the sufficiency of evidence must prevail. In civil cases the genuineness of such a paper must be established by a fair preponderance of the evidence and in criminal cases beyond a reasonable doubt. Writings proved to the satisfaction of the court by the methods and under the rules adverted to, may be used as standards for purposes of comparison with a disputed writing, subject, however, to the qualification that writings which are otherwise incompetent, should never be received in evidence for purposes of comparison.

It is, therefore, sufficient to say with reference to the
" Barnet " and " Cornish " letters that the general rule on the
subject of handwriting expert testimony which we have laid
down herein will properly guide the trial court in the dis-
position of the questions which may arise as to them upon
another trial.

It was further urged at the bar in behalf of the defendant
that the statutes of 1880 and 1888 authorizing comparison of
a disputed writing with any writing proved to the satisfaction
of the court to be genuine are unconstitutional because in
conflict with article I, section II, of the Constitution of this
state, which provides that "trial by jury in all cases in which
it has been heretofore used shall remain inviolate forever."

The argument, in brief, is that this provision of the Con-
stitution requires the submission to the jury in every case
properly triable by jury, of every material fact relied upon
to establish the allegations in controversy. It is unnecessary
to go into an extended examination of the question. We are
clearly of the opinion that these statutes are not unconsti-
tutional and that the proper construction of the statutes re-
quires the submission to the jury of the genuineness of the
standards with which the disputed writing is compared. The
word " court " in the statutes is used in its generic sense, and
includes both judge and jury in a case where a jury is present.
It is significant that the statute of 1880, which was obviously
copied from the statute of Great Britain enacted in 1854, sub-
stitutes the word "court" for the word "judge." We are not
aware that it has ever been decided even in England by any
court of great authority that the ultimate decision concern-
ing the genuineness of the standards of comparison must not
be made by the jury. Be that as it may, however, such a de-
cision would not, in view of the difference between the powers
of the legislature in Great Britain and in this state, and the
significant difference in the phraseology of the statutes, serve
as a guide to the interpretation of our statutory enacements
upon the subject. We have not been referred to and have

not found any decision of this court to the effect that the judge presiding at the trial has the final decision concerning the genuineness of the writings offered as standards of comparison. We see nothing in the language of PECKHAM, J., in McKay v. Lasher, 121 N. Y. 477, which is opposed to the views above expressed. As between a construction which would withdraw from the jury the important question of the genuineness of the standards, and a construction which submits their genuineness first to the judgment of the judge and, upon his acceptance of them, ultimately to the decision of the jury, which must find within the rules above laid down that they are genuine before it can use them, or regard any evidence based upon them, we prefer and are bound to accept the latter construction.

The sufficiency of the proof given of the genuineness of the papers offered as standards is a preliminary point to be determined in the first instance by the court before permitting the papers to go to the jury. If the court, having regard to the rules adverted to, adjudge the papers genuine, it then becomes the duty of the jury in its turn, at the proper time, before making comparison of a disputed writing with the standards, to examine the testimony respecting the genuineness of the latter and to decide for itself, under proper legal instructions from the court, whether their genuineness has been established.

We are aware that a contrary conclusion respecting the duty of the court to submit the genuineness of the standards of comparison to the jury has been reached in Vermont, Rowell v. Fuller's Estate, 59 Vt. 668, and apparently in Massachusetts, Costello v. Crowell, 133 Mass. 352. We are convinced, however, that the sounder rule is the one we have stated.

It may be added that comparisons with standards produced in court, whether at common law or under the statutes, may be made by witnesses, or by the court or jury without the aid of witnesses. Cobbett v. Kilminster, 4 Fost. & Fin. 490;

Hickory v. U. S., 151 U. S. 303; Merritt v. Campbell, 79 N. Y. 625.

Another point urged upon our attention by counsel for the defense is that the learned trial court erred in admitting in evidence upon the trial the testimony of the defendant given at the coroner's inquest. This question must be decided for the guidance of the court below upon another trial. When this testimony was offered in evidence by the district attorney the defendant's counsel interposed the objection that it had not been shown that the defendant was advised of his rights at that time, and had not been warned of his rights by the coroner. What were the defendant's rights at the inquest? If the defendant, when he attended the inquest, was under arrest or formal accusation for the murder of Mrs. Adams, he was entitled to be informed of the charge against him, and of his right to the aid of counsel in every stage of the proceedings, and before any further proceedings were had. (Sec. 188, Code Crim. Pro.) This action is in terms applicable only to examinations before a magistrate. It is, however, merely a codification of the common-law rule, and this court has held that when a person is called upon to testify at a coroner's inquest, convened to inquire into a crime, for the commission of which such person is then under arrest, or upon which he has been formally accused, he occupies the same position, and he has the same rights, as though he were before an examining magistrate. People v. Mondon, 103 N. Y. 211. So, on the other hand, if the person who testifies at the inquest does so simply as a witness, he has none of the rights or immunities of a party. This is the foundation of the rule which is now firmly establishel in this state—that when a person testifies at an inquest as an accused or arrested party, his testimony cannot be used against him upon a subsequent trial of an indictment growing out of the inquest, unless his testimony has been *voluntarily* given after he has been fully advised of all his rights and has been given an opportunity to avail himself of them. People v. Chapleau, 121 N. Y. 267. The logical

and necessary corollary of that part of the rule stated is that when a person testifies simply as a witness and not as a party, his testimony can be used against him even though he is afterwards indicted and tried for the commission of the crime disclosed by the inquest. Hendrickson v. People, 10 N. Y. 14; Teachout v. People, 41 N. Y. 7.

What was the situation at the coroner's inquest held upon the death of Mrs. Adams? It appears that the inquest was commenced on the ninth day of February, 1899. The defendant attended the inquest, was sworn and testified pursuant to a subpoena issued to him by the coroner on the 10th day of February, 1899. The inquest was concluded on the 27th day of February, 1899, and the defendant was arrested at its close upon a warrant charging him with the murder of Mrs. Adams. When the defendant's counsel, upon the trial, interposed the preliminary objection to the admission of evidence of the testimony given by the defendant at the inquest, the learned trial court very properly allowed an examination into the proceedings at the inquest for the purpose of determining whether the defendant had testified as a party or as a witness. People v. Fox, 121 N. Y. 449. The ground of defendant's complaint in this behalf upon this appeal, is that he was not given the opportunity to show that he was in fact an accused party at the inquest and that his rights as such had not been recognized by the coroner. Many pages of the record are filled with the proceedings in this regard showing that from the outset of the inquiry into this subject the district attorney objected to the questions of defendant's counsel; that many of these objections were sustained and that the court by frequent interventions prevented defendant from completing the questions which he had started to frame. The sole purpose of this inquiry was to ascertain a few facts which were matters of record, and of which it was necessary for the court to become informed, to enable it to pass upon the admissibility of the testimony then offered in evidence. It is obvious that the facts to be ascertained were of paramount importance as compared with

the method by which that was to be accomplished. Even if, as must be admitted, many of the questions of defendant's counsel were wide of the mark, a few well-directed suggestions or questions from the court would speedily and clearly have elicited the desired information and thus have avoided the tedious and confusing proceedings which mark this portion of the record. Notwithstanding all this, however, it is plain that the defendant was not under arrest or accusation when he testified before the coroner. It appears that Cornish had testified on the opening day of the inquest. In the course of his testimony he referred to an interview with Captain McClusky, during which he stated to the latter his suspicion that the defendant had sent him the poison package. Without the support of other facts which came to light later in the inquest this suspicion, expressed by Cornish, could not have been a sufficient basis for charging the defendant with the commission of this crime. It further appears that the defendant attended the inquest and testified thereat pursuant to a subpœna issued to him by the coroner, and that defendant was threatened with punishment for contempt if he refused to testify. The coroner had the right to issue a subpoena for defendant and to punish him if he disobeyed it. (Sec. 776, Code Crim. Pro.) The law presumes that a party who is called upon to testify as a mere witness knows his rights. He may decline to testify to anything that may tend to incriminate him. This the defendant could have done had he chosen to claim his privilege. Having failed to do so he cannot now complain.

The record further discloses that the defendant sought to show that the district attorney in his summing up to the coroner's jury stated that he had from the beginnng suspected the defendant of the commission of the crime, but had pretended to suspect Cornish so as to lull the defendant into a sense of security and thus get him to testify. This statement, if made, was after the defendant had testified. Whether it was true or not, or whether the district attorney's suspicions

were well or ill-founded are matters of no consequence, for they could have had no influence on the status of the defendant when he testified. We, therefore, conclude that no material error was committed in respect to the general admission in evidence upon the trial of the defendant's testimony given before the coroner. We do not pass upon the separate objections to specific portions of this testimony, as these may not be presented upon another trial.

Among the questions urged upon our attention there are several which may be grouped together for the purpose of such brief consideration as we deem it necessary to give them. They are (1) that the court erred in its charge to the jury and in its refusal to charge the requests submitted by counsel for the defendant; (2) that prejudicial error was committed in the opening and summing up of the district attorney; (3) that the trial court erred in admitting incompetent evidence and excluding competent evidence over the objection of the defendant; and (4) that the defendant did not receive that fair and impartial trial to which he is entitled under the law.

The first and third of these points need not be discussed. Many of the exceptions taken to the charge, the refusals to charge and the rulings admitting or excluding evidence have been disposed of in the conclusions that the "Barnet" evidence was inadmissible and that the rules governing expert evidence upon the subject of handwriting were not properly applied, and many other exceptions will be obviated by the different course which another trial of this case will necessarily take.

The claims of defendant's counsel that "error was committed in the opening and summing up of the District Attorney," and that "the defendant did not receive that fair and impartial trial to which he is entitled under the law," have been so urgently presented that we should be inclined to discuss in detail the many grounds of error assigned under these heads, were it not impossible to do so, fairly and impartially, without a full and critical review of the twelve thousand folios

of this record for that sole purpose. Such a review would extend this opinion beyond all reasonable and useful limits, and in view of the result reached we deem it unnecessary to discuss or decide the questions raised as to the conduct of the recorder and the district attorney upon the trial.

And, finally, counsel for the defendant contends that the verdict of the jury is not supported by the evidence. In view of the fact that a reversal of the judgment herein is required by the decision reached upon the two questions discussed in the earlier pages of this opinion, it would be obviously unprofitable and improper, in the face of the new trial which must be had, to express our views upon the weight of the whole evidence, and we, therefore, pass defendant's fourth point without further mention.

In conclusion we desire to express our sense of obligation to counsel for both the prosecution and the defense upon this appeal for the fairness and ability with which the case was presented, and for the diligence in research and painstaking arrangement of details which have contributed so materially to lighten the labors of the court.

The judgment of the court below should be reversed and a new trial ordered.

O'BRIEN, J.: There can be no doubt that the People were permitted upon the trial of the defendant, now under review, to give proof of the commission by him of two distinct crimes, namely, the poisoning of Barnet and the poisoning of Mrs. Adams. The only crime charged in the indictment was the murder of the latter. We all agree that a vital part of the testimony with respect to the death of Barnet and its cause was mere hearsay and incompetent. Whether any proof bearing upon the sickness and death of Barnet, or the defendant's connection with it, was admissible upon the trial of the case at bar is a much broader and more important question. The defendant was indicted for feloniously causing or procuring the death of Mrs. Adams, and the fact, if it be a fact, that

at some other time and place he also caused the death of Barnet, is not admissible to prove the offense charged. That is certainly the general rule established by abundant authority and founded upon the plainest principles of reason and justice.

The only question upon which there is an opportunity for minds to differ is whether the events connected with Barnet's sickness and death are so related to the case at bar as to form an exception to the general rule and thus bring the proof that was given at the trial within some one of these recognized exceptions.

The issue in this case was whether the defendant was guilty of causing the death of Mrs. Adams, and not whether he was guilty of causing the death of Barnet. In a more specific sense the issue was whether he sent upon its errand of death, through the mail, the package from which the deceased, through mistake, took the deadly poison that killed her, or to be still more specific, the issue was whether the defendant wrote the direction upon the package with the felonious intent to transmit it by mail to Cornish. If the address upon the package was in fact written by the defendant all the elements of the crime were to be deduced from the maxim *res ipsa loquitur.* The events constituting the history of Barnet's sickness and death did not prove, or tend to prove, the fact that the defendant wrote the address upon the poison package that eventually came to the hands of Mrs. Adams, and that was the material issue at the trial.

The death of Mrs. Adams resulted from poison administered by her own hand, but the real author of her death was the person who made use of the mail to transmit to some one the deadly substance that produced death. In any inquiry concerning the identity of the author of a great crime, where the evidence is purely circumstantial, the human mind instinctively adopts processes in arriving at results that are not sanctioned by the rules of evidence. The hardened and habitual criminal is more likely to be suspected than one who had never committed a crime before. If the party suspected committed a

similar crime before by the same or similar means, or a series of such crimes, proof of these facts goes far to establish his guilt in the popular mind of the offense charged and for which he is on trial; and yet nothing is better established than the rule that the vicious character of a person on trial for a specific offense cannot be shown, unless he himself makes his character or the events of his life a subject of inquiry by becoming a witness in the case. No matter how notorious a criminal the party on trial may be, neither his general reputation nor other specific offenses can legally be proven against him as evidence of his guilt of the offense charged. That such proof is persuasive and has great influence when introduced, upon courts and juries, connot be doubted; but the law does not permit it to be given upon the trial of an issue concerning the guilt or innocence of the party on trial for a specific offense. The reason is that such proof does not bear upon the issue in the case, and hence it is misleading, since it does not follow that a party who has committed one crime, or many, is guilty of some other crime for which he is on trial.

It is said that the evidence culminating in Barnet's death tends to identify the defendant as the author of the death of Mrs. Adams; but that is only another way of asserting the general proposition that the commission by the defendant of one crime tends to prove that he committed another crime, and no matter in what form, or how often that proposition is asserted, or how persuasive and plausible it may appear, it is erroneous and misleading, since it violates a salutary principle of the law of evidence which should be applied in all cases without regard to the question of actual guilt or innocence. If the guilty cannot be convicted without breaking down the barriers which the law has erected for the protection of every person accused of crime, it is better that they should escape rather than that the life or liberty of an innocent person should be imperilled. I think the evidence relating to Barnet's sickness and death would not for a moment be considered competent but for the fact that it creates a strong impression upon

the mind that the author of his death must also be the author of Mrs. Adams' death, since in both cases death was caused by similar means. We may attempt to deceive ourselves with words and phrases by arguing that it is admissible to prove intent, or identity, or the absence of mistake, or something else in order to bring the case within some exception to the general rule; but what is in the mind all the time is the thought, so difficult to suppress, that the vicious and criminal agency that caused the death of Barnet also caused the death of Mrs. Adams. The rule of law that excludes the evidence for such a purpose may be, and probably is, contrary to the tendency of the human mind, but since the law was intended to curb the speculations of the mind and to guard the accused from the result of error in its operation, I am for maintaining the law in all its integrity and not for undermining it by qualifications that rest upon no reasonable or logical basis.

The cases cited to show that proof of Barnet's death was admissible to prove that the defendant wrote the address upon the package sent to Cornish have all been explained in the opinion of Judge WERNER, and it is unnecessary to comment upon them further than to say that in my opinion none of them apply to the case at bar. When these cases and all the considerations urged in behalf of the People have been given due weight, it is still safe to say that the question as to the competency of the proof is by no means clear, but at best is very doubtful, and, therefore, the accused, and not the prosecution, should be given the benefit of that doubt. It is so difficult for the human mind to discard false theories that assume the disguise of truth, and so easy to substitute suspicions and speculations for evidence of facts that proof of the general bad character of the accused, or of participation in other crimes, which is practically the same thing, would no doubt be of great aid to the People in procuring a conviction for the specific offense charged in the indictment. Such proof in a doubtful case might turn the scale against the accused, but the law, for obvious reasons, does not permit it, and it is dangerous to

subvert the rule upon the vague theory that it *identifies* the accused as the author of the offense charged, which means nothing more than that it proves, or tends to prove, that he is guilty.

If the defendant procured or caused the death of Barnet, he is liable to be indicted and tried for that offense, but it is contrary to the plainest principles of justice to require him, when accused of poisoning Mrs. Adams, to clear hmself from all suspicion of participation in another crime of the same character. If the Barnet evidence was properly admitted in the case it must follow that in every case proof of other crimes is admissible, since in every case it can be said, as it is said in this, that proof of the other crime identifies the accused as the real author of the crime charged.

If the defendant wrote the address upon the poison package that was sent to Cornish then he is identified, but proof that at another time he sent another package to Barnet proves nothing in regard to the address. All it proves is that possibly he was capable of the wicked act charged in the indictment, and that is only another way of proving his general bad character, not even by reputation, but by a specific act, which all agree is not admissible.

While the chain of proof to connect the defendant with the poisoning of Barnet is fatally defective in that there is no competent testimony to show that he ever sent to him by mail or otherwise the bottle of Kntnow powders which it is said contained the poison, yet if the missing link had been supplied it would only make the proof all the more dangerous and incompetent. The defendant was required to answer the charge of causing the death of Mrs. Adams, and not the charge of causing the death of Barnet; but by the whole course of the trial and the rulings of the court he was really and substantially required to answer both charges, and since this constitutes a clear error of law defendant is entitled to have the judgment of conviction reversed, and as this may possibly result in a new trial it is scarcely within the province of this court to express any opinion upon the facts.

Comparison of a disputed writing with a writing shown to be genuine is allowed now by the statute. (Laws 1880, ch. 36; Laws 1888, ch. 555.) It is not very clear what the legislature meant in these statutes by the words "disputed writing," and while I think the construction given to these acts by my brethren is quite liberal, notwithstanding the rule that statutes changing the common law are to be strictly construed, yet I am disposed to concur in their view, since it is based on the ground that any other construction would render the legislation practically useless.

PARKER, Ch. J.: I vote for a reversal of this judgment on the ground that the court erred in receiving the testimony of Doctor Douglass to the effect that Barnet stated to him in his last illness that he had received a box of Kutnow powder through the mail. The declarations of Barnet under the circumstances disclosed by the physician were not competent to show that Barnet received Kutnow powder through the mails. As the fact thus sought to be established was one of vast importance, the exception taken to the admission of the testimony requires a reversal of the judgment.

I dissent from that part of the prevailing opinion which, in effect, holds that had the fact been established by competent evidence that Barnet had taken a dose of Kutnow powder containing cyanide of mercury which he had received through the mails, nevertheless the evidence tending to show that the defendant mailed that Kutnow powder to him is inadmissible on the trial of the defendant for the killing of Mrs. Adams.

Of course it is not admissible unless it tends to prove that Molineux is responsible for the death of Mrs. Adams. If it does tend to prove such responsibility, then it is admissible, although the facts proved establish that the defendant committed another crime. It is often carelessly said that the People cannot upon trial under an indictment prove facts showing that defendant committed another crime, a statement which is incorrect without the addition of the qualification: Unless the facts establishing the other crime also tend to establish the

commission by defendant of the crime for which he is being tried.

There is no controversy in this court—nor out of it—so far as I know, touching the general rule that evidence of the commission by him of other crimes is not admissible upon the trial of a defendant charged with crime. It is only on rare occasions that proof of the commission of another crime by a defendant is either necessary or helpful toward establishing the crime with which he is charged. Hence the evidence is ordinarily irrelevant, while at the same time its admission would necessarily operate to so prejudice a jury against a defendant as that in a doubtful case it might control the verdict. Therefore the courts long ago decided that a defendant should not be prejudiced by the admission of evidence of other crimes committed by him which in no wise tends to establish that he committed the crime for whose commission he is on trial. But it has never been held by any court of responsible authority that the People cannot prove the facts constituting another crime, when those facts also tend to establish that the defendant committed the crime for which he is on trial. Such a holding would accomplish the absurd result of permitting a rule intended to prevent a defendant from being prejudiced in the eyes of the jury because of his life of crime to so operate in certain cases as to prevent the People from proving the facts necessary to convict him of the crime charged. The interests of justice, which require alike the conviction of the guilty and the acquittal of the innocent, make it the duty of courts to preserve this rule in its entirety, for by it a defendant will be protected from the prejudice resulting from the evidence of other unrelated crimes committed by him, while the People will not be prevented from proving the facts of another and related crime which tend to establish the commission by the defendant of the crime charged.

There are many cases both in England and in this country where the People are permitted to prove the commission of another crime by defendant, because it tended to prove him guilty of the one for which he was standing trial. Among

them may be found the following: People v. Place, 157 N. Y. 585; People v. Van Tassel, 156 N. Y. 561; People v. Mc-Laughlin, 150 N. Y. 365, 386; People v. McClure, 148 N. Y. 95; People v. Harris, 136 N. Y. 443; People v. Murphy, 135 N. Y. 451; People v. Dimick, 107 N. Y. 13, 32; People v. Everhardt, 104 N. Y. 591; Pontius v. People, 82 N. Y. 339; Hope v. People, 83 N. Y. 418; Mayer v. People, 80 N. Y. 364; Pierson v. People, 79 N. Y. 424; Coleman v. People, 58 N. Y. 555; Copperman v. People, 56 N. Y. 591; People v. Zucker, 20 App. Div. 363; affd., 154 N. Y. 770; Slant v. People, 4 Park Crim. Cas. 132; Hawes v. People, 88 Ala. 37; People v. Otto, 4 N. Y. Crim. Rep. 149; People v. Wood, 3 Park. Crim. Rep. 681; Commonwealth v. Jackson, 132 Mass. 16; Commonwealth v. Bigelow, 8 Met. 235; Commonwealth v. Stone, 4 Met. 43; In re Held, 1 C. H. R. 46; In re Smith, 1 C. H. R. 49; In re Coffee, 1 C. H. R. 52; In re Dougherty, 4 C. H. R. 166; Commonwealth v. Johnson, 133 Pa. St. 293; Commonwealth v. Russell, 156 Mass. 196; Rex v. Culclough, 15 Cox Crim. Cases, 92; Regina v. Gardner and Wife, 3 Foster & Finl. 681; Regina v. Cotton, 12 Cox Crim. Cases, 400; Regina v. Geering, 18 L. J. Mag. Cas. 215; Regina v. Hoeson, 14 Cox's Crim. Cas. 40; Machin v. Atty-Genl., 17 Cox Crim. Cas. 704; Regina v. Roder, 12 Cox Crim. Cas. 630; Regina v. Flannagan, 15 Cox. Crim. Cas. 403; Goerson v. Commonwealth, 99 Pa. St. 383; People v. Seaman, 107 Mich. 348; Hester v. Commonwealth, 88 Pa. St. 139; Krann v. Commonwealth, 87 Pa. St. 301; Brown v. Commonwealth, 76 Pa. St. 319; People v. Foley, 64 Mich. 148; People v. Rogers, 71 Cal. 563; Commonwealth v. Choate, 105 Mass. 451; Rex v. Clewes, 4 Car. & Payne, 354; Commonwealth v. McCarthy, 119 Mass. 354; Commonwealth v. Miller, 3 Cush. 244.

It is unnecessary to refer to these cases in detail, as it is sufficient for my present purpose to say that each one of them presents a case in which proof of the facts tending to show the commission of another crime by the defendant on trial was

admitted for the purpose of aiding in establishing the fact that he committed the offense charged. Indeed, no one denies that this has often happened, nor questions that in the future it will and should happen again and again; but instead it is said in effect that this case is not within the rule as interpreted by those cases. In other words, that the facts of this case do not bring it within the exceptions—so called—created by those cases. The argument proceeds upon the assumption that the exceptions are not to be added to; but that as large a number had been created when this trial began as should be tolerated, instead of treating these decisions as establishing the principle that the facts of another crime may be proved by the People whenever their tendency is to prove the commission of the crime charged.

Horton on Criminal Evidence (9th ed. sec. 48); Underhill on Evidence (sec. 58); Abbott's Trial Brief—Criminal Causes—(sec. 598), are cited in support of the statement that " Generally speaking, evidence of other crimes is competent to prove the specific crime charged when it tends to establish (1) motive; (2) intent; (3) absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others; (5) the identity of the person charged with the commission of the crime on trial." This list of exceptions has been extended in terms in some of the opinions in the cases cited, *supra,* but it is of sufficient length for the purposes of this discussion. The argument then proceeds with an attempt to show that evidence authorizing a finding that Molineux killed Barnet is not within any of the exceptions, and, hence, it is assumed that it is not competent. I think the real test in such cases is: Does the evidence of the other crime fairly aid in establishing the commission by defendant of the crime for which he is being tried? And that test, and none other, is fairly established by the authorities.

It is conceded that cases have arisen where another crime was permitted to be proved for the purpose of establishing a

*motive* for the crime for whose commission defendant is on trial—just that and nothing more. Motive is an important element, it is true, in certain cases, but it is only one element, and yet if it is necessary to establish that the defendant had a motive in committing the crime charged, proof of another crime may be permitted for that purpose. *Intent* is another essential element which must be made out before there can be a conviction for a crime, and, if the commission of another crime by a defendant tends to establish a guilty intent on his part in the case on trial, the other crime may be proved. So, if a defendant claims that the killing was due to mistake or accident, the facts of another crime may be proved by the People if those facts tend to show that there was neither mistake nor accident on the part of the defendant. Other cases may be found where evidence of another crime has been received simply because it tended to identify the person on trial. Judge PECKHAM, in People v. Sharp, 107 N. Y. 427, 468, refers to " a class of cases in which the facts show the commission of two crimes and that the individual who committed the other crime also committed the one for which the defendant is on trial. Evidence is then permitted to show that the defendant was the person who committed the other crime, because in so doing, under the circumstances and from the connection of the defendant with the other crime, the evidence of his guilt of such other crime is direct evidence of his guilt of the crime for which he is on trial." In People v. Murphy, 135 N. Y. 451, the evidence of another offense was held admissible because it had been shown to be " a part of the same criminal scheme " as the main offense.

An examination of the case cited, *supra,* discloses still other situations in which the proof of another offense has been sanctioned, and those cases show that almost every element essential to a conviction for crime either has been established or the evidence tending to prove it has been supported and strengthened by proof of the commission of another crime by the same party. In not one of those cases is it suggested that

there is any element of a crime that may not be proved in that way, and this court long ago distinctly laid down the rule, as it seems to be established by the authorities generally, as follows: "Evidence tending to prove any fact constituting an element of a crime charged in an indictment is competent, although it may tend to prove the prisoner guilty of some other crme." Weed v. People, 56 N. Y. 628. And this conclusion has been followed in this court recently in three cases by expression quite as comprehensive. In People v. Van Tassel, 156 N. Y. 561, 565, where it is said: "Evidence of other transactions, otherwise material or relevant, is not inadmissible merely because it tends to prove another crime;" and in People v. Place, 157 N. Y. 585, 598, where the court carefully stated the rule in its entirety in two sentences, as follows: "It is an elementary principle of law that the commission of one crime is not admissible in evidence upon the trial for another, where its sole purpose is to show that the defendant has been guilt of other crimes, and would, consequently, be more liable to commit the offense charged. But if the evidence is material and relevant to the issue, it is not inadmissible because it tends to establish the defendant's guilt of a crime other than the one charged;" and People v. McLaughlin, 150 N. Y. 365, 386, is to the same effect. Here we have a broad and comprehensive test—one that looks toward justice: Do the facts constituting the other crime actually tend to establish one or several elements of the crime charged? If so, they may be proved. Measured by this test it was competent for the People to show that Barnet came to his death through cyanide of mercury contained in a dose of Kutnow powder taken from a box received by him through the mails, in view of the facts and circumstances proved tending strongly to show that one mind conceived and one hand executed all of the details of both crimes.

But I shall not discuss the evidence from that point of view, for it is my purpose to attempt to show that even if we assume the contention to be sound that the People can prove facts constituting another crime only when they are within one of the

exceptions enumerated, the Barnet evidence is clearly within the fifth enumerated exception in that it tends to establish " the identity of the person charged with the commission of the crime on trial." There are features of the evidence that bear upon two of the other exceptions, but for the sake of brevity only the one named will be considered.

In the prevailing opinion, after a preliminary discussion of the facts relating to the death of Mrs. Adams, it is said: " The next and final step in the case of the prosecution would have been to prove the defendant's connection with the handwriting of the address upon the poison package." This done, it is conceded that a prima facie case would have been established on the part of the People. Evidence to that effect was given by three lay witnesses and also by a number of handwriting experts. But the People were not obliged to stop there. If there were other evidence tending to show that the defendant sent the poison package to Cornish, it was the duty of the prosecuting officer to present it to the court and the jury. Of course no one saw the person who sent the package mail it and, aside from the proof of the handwriting, resort had necessarily to be had to circumstantial evidence to prove who was the sender.

The package sent to Cornish contained a bromo seltzer bottle filled with bromo seltzer in which had been put cyanide of mercury, and Mrs. Adams on taking a dose from that bottle for sick headache obtained such a quantity of cyanide of mercury as to lose her life. Cornish also took a small dose but it did not prove fatal. Cyanide of mercury is a rare and unusual poison, not kept on sale by druggists generally as strychnine and many other poisons are, and the books of the medical and chemical professions record only five cases, prior to these, of death by that poison. Dr. Phillips, a physician who was called to see Cornish, suspected that he had taken cyanide of mercury because of the similarity between the symptoms displayed by him and those exhibited by Barnet, whom he had treated a little over a month previous. The fact

that an attempt had been made upon the lives of two persons within so brief a period by this rare and unusual poison naturally suggested to those whose duty to the state it was to find the murderer if possible that it would quite likely appear that one person sent both packages. The autopsies showed that both Barnet and Mrs. Adams died from that poison, and in the Kutnow powder of which Barnet told his physician he had partaken was found cyanide of mercury.

On May 27, 1898, a letter box was hired from one Heckman in the name of H. C. Barnet. Barnet did not rent it and Heckman positively identified the defendant Molineux as the man who did rent it and gave his name as H. C. Barnet. To that letter box was sent, among other things, patent medicines, to which other reference will be presently made. Some one in the name of Barnet wrote to the Marston Remedy Company a letter inclosing five dollars with a request that he be sent one month's treatment for impotency, and the address of the letter box which Molineux had rented in the name of Barnet was given. In reply the Marston Remedy Company sent a blank diagnosis sheet, addressed to H. C. Barnet at that private letter box as requested, with directions that the questions thereon be answered. The author of the answers to the questions in that diagnosis blank gave the following description of himself: (1) single man; (2) thirty-one years of age; (3) chest measurement thirty-seven inches; (4) waist measurement thirty-two inches; (5) there had been consumption in his family; (6) business sedentary; (7) contemplating matrimony; (8) eyes and complexion "yellowish;" (9) seeking treatment for impotency. This in no respect described the real H. C. Barnet, who was a large man weighing one hundred and eighty pounds, but according to the People's evidence it described Molineux with perfect accuracy. He was single; was thirty-one years of age in the very month the letter was written; his tailor had measured him less than two months before and testified his chest measurement was thirty-seven inches and his waist measurement thirty-two inches; the death certificate of his

maternal grandmother showed that she died of consumption; his business was sedentary; he was contemplating matrimony; the jury had an opportunity to observe his eyes and complexion, which the People contend are "yellowish," and he was seeking a remedy for impotency, for on June 1, 1898, Molineux wrote a letter to Dr. James Burns, signing his own name, inclosing twenty-five cents and directing that a remedy be sent to his Newark address. Both the letter and the envelope were put in evidence, and it was shown that the remedy was for impotency. There was also evidence that the diagnosis blank was in the handwriting of the defendant, and it needs no argument to support an assertion that the jury had the right to find from all this evidence that Molineux was the man who used this letter box and used the name of Barnet for his own purposes. According to the claim of the People, then, Molineux positively identified himself as the renter of the letter box and the seeker after remedies for impotency in the Barnet case, and Heckman identified him as positively.

The identity of Molineux in the Barnet case being established, the People were at liberty to show that the facts and circumstances in the Barnet case and the Cornish case were of such a character that they must necessarily have resulted from the action of a single mind. To have shown that would necessarily have identified the defendant as the criminal actor in the attempt to poison Cornish. It turned out that before the attempt to poison Cornish was made some one hired a private letter box in his name, and, as in the Barnet case, it was not hired by Cornish, nor by him. Now, while Molineux personally hired the box in Barnet's name at Heckman's, he did not personally hire the box at Koch's, at 1620 Broadway, which was hired in Cornish's name. But it seems that Koch, in addition to renting private letter boxes to persons who had personal and confidential correspondence which they wished to keep out of the regular channels of their mail matter, sent out a publication called the "Studio," and on December 31, 1897, about a year before the death of Mrs. Adams, Molineux

wrote a letter to "Editor 'Studio,'" in which he asked for a copy of the paper. About six months later Koch sent Molineux some circulars relating to his business and one of them described his private letter boxes. Between December 12 and 17, 1898, Molineux called on Koch at his place of business and talked about the letter boxes, but said he was not prepared to make an arrangement for one as he only called for a friend. A few days later and on December 21st another man called and rented a box in the name of H. Cornish, but Koch testified when Cornish stood up in court that he—Cornish—was not the man who rented the box.

After the hiring of the box some one wrote for Kutnow powders in the name of H. Cornish and directed that they be sent to the letter box at 1620 Broadway which the stranger had hired, and the letter was written on the same kind of blue paper, with a tri-crescent emblem at the top, as Molineux used in his letter to Dr. James Burns on June 1st asking for a remedy for impotency. The Kutnow powders were sent to 1620 Broadway in pursuance of the request, but by mistake were placed in the wrong box. A letter was also written on the blue stationery with the tri-crescent emblem as in the other cases to Von Mohl & Company, of Cincinnati, requesting a five days' trial of their remedy for impotency, the address given being 1620 Broadway. This letter was not written by Cornish, "Calthos" was the name of the remedy of Von Mohl & Company and a box of it was sent to H. Cornish at 1620 Broadway. Some person other than Cornish, but in his name, sent a letter, also written on blue paper with the tri-crescent emblem as in the other instances referred to, to Frederick Stearns & Company, of Detroit, Michigan, concerning one A. A. Harpster, in which the address of H. Cornish was given as 1620 Broadway. I shall not refer further to the Harpster incident, which is one of considerable importance as disclosed by the record, other than to say in passing that Harpster was a great friend of Cornish, and had taken sides with him in Cornish's controversy with Molineux, thus arousing the enmity of Mol-

ineux, who took other steps looking to his injury beside writing the letter referred to asking for confidential information in relation to Harpster from his former employers, if he did write it.

Cornish received through the mails a bottle of bromo seltzer containing cyanide of mercury, a dose of which resulted in the death of Mrs. Adams. Molineux was a chemist and a manufacturer of dry colors, and kept large quantities of prussian blue and other dry colors from which cyanide of mercury can be made. Three lay witnesses, who were familiar with the handwriting of Molineux, testified that the letters signed " H. Cornish," to which reference has been made, as well as the Barnet letters and the answers in the diagnosis blank, were in the handwriting of Molineux. And the testimony of a number of prominent experts in handwriting is to the same effect. But aside from that testimony there is to be gleaned from the letters themselves and the circumstances surrounding and attending their writing very strong evidence that one brain conceived and carried out both schemes. In each case the letter box was hired in the name of the intended victim; in each, remedies for impotency were written for in the name of the intended victim; both the Cornish and the Barnet letters were undated; both series of letters, as well as the address on the poison package, contained misspelled words; in each case a rare poison—cyanide of mercury—was employed; in both cases the mails were used to convey the poison to the intended victims; in both cases samples of Kutnow powder were written for, and were received at both boxes; Calthos, a remedy for impotency, was also received at both boxes; Barnet and Cornish were members of the same club, and the poison sent to each was contained in a simple headache remedy in ordinary use. These facts and circumstances standing wholly uncontradicted and unexplained, as they do in this record, force the mind almost irresistibly to the conclusion that the same man desired the death of both Barnet and Cornish and plotted and worked to accomplish it. Certainly a jury are at

liberty to draw that inference, and if they do the conclusion will necessarily follow that Molineux was the criminal actor in the Cornish case, because he was positively identified as the actor in the Barnet case both by the testimony of Heckman and by Molineux's description of himself in the diagnosis blank.

The evidence in the Barnet case, therefore, tends to identify Molineux as the sender of the poison package in the Cornish case, thus supporting the evidence of the lay and expert witnesses who testified that the address on the poison package sent to Cornish was in the handwriting of Molineux. The Barnet evidence, therefore, is strictly within one of the exceptions referred to in the prevailing opinion. It is said in People v. Dimick, 107 N. Y. 13, 32, that the People have the right, when it is material, to give proof of the facts constituting another crime and have it submitted to the jury under proper instructions, although such proof may be inconclusive, and if this view of a unanimous court in that case should be followed the Barnet evidence would be competent, although direct proof of the sending of the Kutnow powders through the mails should not be made out on the retrial.

This argument, however, has proceeded on the assumption that, in order to justify the retention of the evidence relating to the Barnet crime, it is necessary to establish every element relating thereto, which necessarily includes the receipt by Barnet of Kutnow powders through the mails. Hearsay evidence to that effect was admitted by the court and its admission was error, but we cannot assume that on the new trial which is about to be ordered the People will not be able to establish that fact by competent evidence, and great care should be taken not to close the door against such evidence, if it exists, for that justice which the safety of society requires and the law demands has not as yet been meted out to the murderer of Mrs. Adams.

GRAY, J.: I think the judgment of conviction should be reversed and that the defendant should have a new trial, for error in the admission of testimony relating to declarations

made by Barnet to his physician of his having received through the mail Kutnow powders, of his having taken a dose of them and of his condition being due to that fact. In any view, such evidence was quite incompetent and, of course, prejudicial to the defendant. With respect to the evidence relating to the death of Barnet, with some hesitation, I have reached the conclusion that it was admissible, within the recognized exceptions to the rule, which excludes proof by the prosecution of another crime. Unless the evidence was relevant to connect the defendant with the commission of the crime charged in the indictment, it was immaterial and its effect could not have been other than prejudicial to his case. But it is well established that evidence of facts, which show, or tend to show, the commission of another crime, is not for that reason inadmissible against the defendant, if they tend to prove his guilt under the indictment. If these other damaging, or incriminating, facts throw any light upon motive, or intent; if they establish the absence of mistake, or accident; if they exhibit a scheme, involving the commission of several crimes; or if they may become a means of identification of the person charged with the commission of the crime on trial, they become admissible for that purpose.

The theory of the prosecution was that the defendant had caused Barnet's death by poison from motives of jealousy and had attempted to poison Cornish from motives of hatred provoked by personal conflicts and quarrels. It is plain that there could be no common motive and the theory of the prosecution could only become serviceable, if the evidence relating to the commission of a former crime would identify the defendant as the common perpetrator of both crimes. In my opinion, all of the exceptions to the general rule of evidence mentioned may be eliminated, as of useless consideration, except that which makes all legal evidence admissible for the identification of the defendant. I cannot perceive its relevancy for the purpose of proving intent, or the absence of mistake, or accident. The defendant was shown to be familiar with

the use of chemicals and to have all the opportunities to concoct the particular poison, which Cornish received through the mail and from the taking of which Mrs. Adams subsequently died. If the evidence showed that he had sent this bottle, containing its poisonous compound, to Cornish, the felonious intention would be evident and there would be no room for the idea of ignorance, mistake, or accident. It would be unnecessary to enter upon the proof of the other criminating facts, in order to supply those elements of a case. Neither is it conceivable that the Barnet evidence would be admissible to prove a scheme, which involved the commission of further crimes in connection with the killing of Barnet. There was no pretense of that. But there may be sufficient in the circumstances of Barnet's death to furnish support for the theory that the same person committed both crimes and, with other circumstances testified to, to tend to an identification of the defendant. The rarity of the deadly drug used, within a few weeks, in both cases; its concealment in the same kind of powders, as taken by Mrs. Adams and as found in Barnet's room after his death, and the use of the mail by the sender of the poison, in connection with the evidence showing, or tending to show, that defendant made use of the names of Barnet and of Cornish, in the hiring and use of private letter boxes, for various purposes, including the procuring of patent medicines, all of these facts would, if competently proved, have a tendency to show a unity, or similarity, of mental plan and operation, and bear upon defendant's identification, however inconclusive in themselves. While, for the reasons I have briefly assigned, I think the evidence relating to Barnet's death was not inadmissible for the prosecution's case, the admission of the testimony of the physician, as to what Barnet told them about the reception and the taking of the powders, was distinct error and, in view of the nature of the case made, one which cannot be overlooked. It was objectionable as being hearsay evidence and as not told for the purpose of treatment. Without that testimony there was no evidence that Barnet received

any Kutnow powder containing the poisonous admixture through the mail, or that he took any of it, except as might be inferred from the autopsy performed upon his body some time after Mr. Adams' death.    If those material facts should be competently proved upon another trial, I am of the opinion that the circumstances of Barnet's death would be within the province of the jury to pass upon as determining, in connection with all the other facts and circumstances, whether the same person poisoned Barnet and attempted to poison Cornish, and whether they pointed conclusively to the defendant as the criminal agent.

As to the handwriting evidence, I concur with Judge WERNER's construction of the statutes; but, while conceding the admissibility of opinion evidence as to handwriting, I am, nevertheless, indisposed to concede to it such evidentiary character and strength as, like a fact, to constitute a link in the chain of circumstantial evidence, upon which a capital conviction shall depend.    Such evidence is entitled to be considered by the jury as corroborative of other evidence, connecting the defendant with the commission of the crime.

In view of the responsibility imposed upon this court in capital cases, I think that the circumstances relied upon to support the defendant's conviction should be such as; when considered with the opinion evidence, to convince the mind of its absolute correctness.

Judgment of conviction reversed and new trial ordered. Opinion by WERNER, J., with whom BARTLETT and VANN, JJ., concur; O'BRIEN, J., in mem.; PARKER, Ch. J., GRAY and HAIGHT, JJ., concur in result, and dissent only as to the admissibility of the evidence tending to prove the poisoning of Barnet; PARKER, Ch. J., and GRAY, J., writing; HAIGHT, J., concurring with PARKER, Ch. J.